MILTON THOMPSON, Appellant, v. ST. JOSEPH RAILWAY, LIGHT, HEAT & POWER COMPANY.—131 S. W. (2d) 574.

Court en Banc, September 5, 1939.*

*NOTE: Opinion filed at May Term, 1939, May 2, 1939; motion for rehearing filed; motion overruled at September Term, September 5, 1939.

32

*R. E. Culver, Ben Phillips, Alve F. Lindsay* and *B. L. Kauffman* for appellant.

*Mayer, Conkling & Sprague* for respondent.

34

LEEDY, J.—Action by plaintiff, appellant here, to recover damages for alleged personal injuries. Plaintiff had a verdict in the sum of $20,000, which the trial court set aside, and sustained defendant's (respondent's) motion for a new trial, and plaintiff appealed. The appeal was argued and submitted in Division # 1, wherein an opinion was adopted by which the order and judgment granting the new trial was reversed and the cause remanded with directions to reinstate the verdict, and enter judgment in conformity therewith. Thereafter, on the division's own motion, the cause was transferred to the court en banc, where it has been re-argued, briefed and submitted.

The trial court, in sustaining defendant's motion for a new trial, assigned the following reasons:

''1. For failing to give Instruction B (demurrer to the evidence), offered by defendant.

''2. For giving Instruction No. 2 offered by plaintiff; that said Instruction No. 2, in the opinion of the court, did not require the jury to find all the necessary facts to constitute negligence nor all the necessary facts to constitute agency.''

The issues on the present submission have been sharply narrowed, so that the only contentions are:

1. That the demurrer should have been sustained because (a) no act or omission of the defendant was the proximate cause of injury, and (b) plaintiff was guilty of contributory negligence as a matter of law;

2. That error was committed in giving plaintiff's Instruction No. 2 because (a) the instruction purported to cover the whole case and directed a verdict but omitted altogether a vital element of plaintiff's case, and (b) in submitting to the jury a pure question of law. The divisional opinion held that the question of defendant's negligence, as well as that of plaintiff's contributory negligence, were both for the jury, and as we have come to the same conclusion, said opinion, with certain modifications, may be used as the general framework for the present opinion, insofar as those questions are concerned. It will be so utilized without resort to quotation marks to distinguish between old and new matter.

Plaintiff was an electrician and had been employed as such for

about 15 years by the city of Wathena, Kansas. About April 6, 1933, he was directed by the city clerk to remove a meter box from a pole (referred to in the evidence as the meter box pole), and while attempting to do so, he came in contact with primary wires carrying 2300 volts and received severe injuries. The city of Wathena obtained its electricity from defendant, but owned and operated the transmission line which passed through the town of Elwood, Kansas. Elwood is on or near the Missouri River, and immediately west of St. Joseph, Mo. Wathena is a few miles west of Elwood. Prior to January 2, 1933, Elwood received its current from Wathena transmission line under a contract with Wathena, but on that date Elwood entered into a contract with the Doniphan County Power & Light Company, (referred to hereinafter as the Doniphan Company) by which contract that company was to furnish current to Elwood, and in order to then furnish Elwood, the Doniphan Company leased from Wathena a part of the Wathena transmission line. The lease was for a period ending March 31, 1933. The portion leased was from the bridge-end, across the river from St. Joseph, to a certain pole in the west part of Elwood. The Doniphan Company, a Kansas corporation, also got its current from defendant. January 2nd, the Doniphan Company began moving current over the leased line and selling same to Elwood, which in turn sold and distributed, over its own distribution system, to its customers.

In March, 1933, the Doniphan Company built, or caused to be built its new transmission line to Elwood. For the purposes of this submission respondent expressly states it may be assumed that the Doniphan Company employed it (defendant), to build the line. The construction of this new transmission line was completed on March 31, 1933, and on and after said date the Doniphan Company began transmitting current to Elwood over said new line, and the leased line connection with the Elwood distribution system was severed, except in one particular, and said leased portion turned back to Wathena.

In his petition plaintiff alleged, in substance, that the Doniphan County Light & Power Company was a corporation organized under the laws of Kansas and that it employed the defendant, St. Joseph Railway, Light, Heat & Power Company, which it was alleged was a Missouri corporation, to build for the Doniphan County Light & Power Company the new transmission line hereinabove described; that no house, business or other connection using electricity was connected to the wires leading to or on the meter box pole, but that defendant knew this fact, and that defendant nevertheless had permitted the current to flow to said meter box pole and along the wires which ran from the top crossarm to the bottom crossarm of said pole; that on April 7, 1933, and long prior thereto, there was in force and effect, use and operation among electricians, linemen and

other men engaged in electrical work and the transmission of electric energy and in the handling of electricity of high voltage, a rule, custom, usage and common and invariable course of action for the electrician or employee to sever and disconnect certain wires at certain points; that said custom required that the defendant, at the time the service was discontinued from the main Wathena transmission lines to the Elwood lines at the pole upon which said meter box was located, should have disconnected said wires at the crossarm located near the top of said pole and running in a generally easterly and westerly direction; that the defendant knew of such rule, custom and usage, but nevertheless carelessly failed to disconnect said wires at said top crossarm and carelessly permitted said electric energy to run from said top crossarm along the wires down said pole to the lower crossarm; that defendant knew, or by the exercise of ordinary care could have known that upon the termination of the lease Wathena would likely remove the meter box which was owned by Wathena, from the meter box pole; that in order to remove the meter box the employee or employees of Wathena going up the pole to remove the box would be required, in the discharge of their duties, "to come in close proximity to and in contact with the heavily charged wires" negligently left on the pole when the severance was made; that on April 7, 1933, and after the severance was made, plaintiff in the discharge of his duties as an employee of Wathena, climbed the meter box pole to remove the meter box; that in the performance of his work and in order to remove the box, it was necessary for him to disconnect the two wires from the bottom crossarm; that he disconnected these wires "and took hold of and was in the act of bending them back in order to complete his work upon said pole," when as a result of defendant's aforesaid negligence he received the injuries complained of. The answer, insofar as it raised issues to be discussed here, contained a general denial and a plea of contributory negligence. The demurrer to the evidence is based on the propositions, first, that no act or omission of the defendant was the proximate cause of the injury; and second, that the plaintiff was guilty of contributory negligence as a matter of law.

It would be difficult to clearly state the facts without a picture of the physical situation before the reader, hence we attach defendant's Exhibit A, which exhibit represents the photographic appearance of the meter box pole on September 15, 1933, and is as follows:

At the top of the meter box pole shown in the above photograph, the wires AA, BB and CC running east and west were the wires constituting the Wathena transmission line. From January 2, 1933, to March 31st, when the connection on the meter box pole was severed by one Sexton, Elwood was furnished current by the Doniphan Company over the leased portion of the Wathena line, and part of this current was measured at the meter box appearing on the meter box pole in defendant's exhibit A. The remainder of the Elwood current was measured at another meter box in Elwood, but the sec-

ond meter box pole is not here concerned. When Wathena was furnishing current to Elwood and during the period the Doniphan Company furnished Elwood over the leased line, the wire BB was physically connected with HH at J and there was a physical connection between CC and II at K. The wires II and HH were attached at the double crossarm, and then extended down to the bottom crossarm and into the right side of the meter box. In the meter box, the current was measured and then delivered to the Elwood distribution system. The two wires just below the double crossarm and extending to the left (west) are extensions of E and D, and were a part of Elwood's street lighting system, prior to March 31st, when Sexton made the severance at the meter box pole. Defendant contends that on March 31st, there was a line from the meter box pole to a filling station in Elwood and southeast of the meter box pole. The existence of the filling station line on March 31st is one of the controverted questions.

On the afternoon of March 31st when the Doniphan Company's new transmission line was completed, Sexton and his foreman, Bibbs, both of whom were employees of defendant, went to the meter box pole to sever the connection from the leased Wathena line, so connection could be made with the Doniphan Company's new line, and under the direction of Bibbs, Sexton made the severance. He severed and removed the wires which had been attached to BB and CC, wires of the Wathena line. The wires that Sexton severed from the Wathena line ran down and connected at the double crossarm with H and I on the right (east) side of the meter box pole. He also severed H and I 6 or 8 inches below the bottom crossarm and between the bottom crossarm and the meter box. He severed F and G, left side of pole, 6 or 8 inches below the bottom crossarm and between the crossarm and the meter box. The 6 or 8 inches of wire left dangling after the severance below the bottom crossarm are in the parlance of linemen called "pigtails." And these "pigtails" are important in this cause as will appear hereinafter. Sexton, who was called as a witness by plaintiff, testified that he bent the "pigtails" around the insulators "to make it safe." He did not cut F and G below the double crossarm and above L and M, because as he testified, the filling station line was then connected at L and M, and had he cut F and G above L and M, the filling station line would have been put out of commission. As stated, the question of whether the two wires L and M ran from F and G to the filling station was one of the main controverted facts in the case. If the filling station line were ever on the meter box pole at any time involved here, it was removed before Exhibit A was taken. Plaintiff's evidence, aside from the testimony of Sexton, tends to show such line was not connected with the meter box pole when Sexton made the severance on March 31st. Plaintiff introduced five witnesses, including himself,

on this question. Four witnesses on the part of defendant and plaintiff's witness Sexton testified that on the date just mentioned, the two wires L and M ran off of F and G to the filling station.

Immediately after Sexton had finished with the meter box pole the current for Elwood was turned into the Doniphan Company's new transmission line, but because F and G were not severed immediately below the double crossarm, these wires remained charged with 2300 volts, the current reaching F and G through a line, extensions of F and G, that extended south and west from the meter box pole to a transformer. Defendant did not claim that this extension of F and G served anyone, but gave the alleged existence of the filling station line on March 31st as the reason for not severing F and G immediately below the double crossarm.

About April 6th, Connie Poirer, the city clerk of Wathena, told plaintiff to get the meter box "and the equipment" Wathena had on the meter box pole. When the clerk, a witness for plaintiff, was asked what equipment Wathena had on the pole, he answered, "A meter, primary and secondary transformer, all in a box." He was further asked: "Q. Did the City of Wathena have anything whatever to do with the crossbar just located above the meter box? A. To my knowledge the City of Wathena had nothing to do with that except in its relation with the box; the wires had to come down and fastened in the box. Q. When you told Mr. Thompson, as I understood you before, to get that meter box, did I understand you to say strip the pole? A. He was to take the unnecessary wiring off the pole." However, plaintiff was indefinite as to whether the city clerk told him to get anything except the meter box from the meter box pole here involved.

Raymond Kirschbaum, an employee of Wathena, but not an electrician, accompanied plaintiff as a helper on April 7th, when plaintiff went to get the meter box. On arrival at the meter box pole both plaintiff and his helper climbed the pole, and as we infer, plaintiff went up on the north side. They had rope and wire and planned to so attach these to the box that it could, when detached from the pole, be let down with the rope over the bottom crossarm. Plaintiff had rubber gloves, but they were in his car near the foot of the pole. The top of the meter box was 18 inches below the bottom crossarm, and plaintiff went far enough up the pole so he could lean over the bottom crossarm and make, with the assistance of his helper, the necessary attachments to the box. In order to have working room, he detached H and I from the insulators on the bottom crossarm. In detaching these wires plaintiff handled each one separately, without injury. When F and G were detached, they, with the "pigtails" thereon, dangled about and in order to get F and G out of the way plaintiff took one in each hand with the intention of bending them out of the way and when he did this he received a charge of 2300 volts and the injuries complained of.

Plaintiff testified that "we (Wathena) had a letter that the line was dead," having reference to the condition at the meter box pole. However, he admitted that he knew nothing about the contents of the letter, but claimed that the Wathena city clerk told him "that they were dead." The *they*, we infer, has reference to the wires on the meter box pole, except the top wires, AA, BB and CC, which were the Wathena transmission line. Before plaintiff went up the meter box pole he ascertained that the wires thereon were "unhooked from the main line" and he "went up to cut the box loose and take down those wires." He also observed that "the meter box was cut loose," that is, wire connection severed; and that "pigtails" were below the bottom crossarm at F, G, H and I. Plaintiff testified, in effect, that the "pigtails" signified according to custom among experienced linemen, that the wires were dead. "Q. According to all rules in the electrical trade, special linemen that handled high tension wires, you may tell whether or not it is customary, the customary manner, to leave high tension wires to hang loose six or seven inches as you testified they were that day." Objection to the question was made and overruled and defendant answered, "No, sir." He also said that he knew such custom when he went up the pole. Plaintiff. admitted that he could have walked two and a half blocks, south and west, and, by doing so, could have, "by standing on the ground and looking up," ascertained that the wires he grasped when injured were "hot and had 2300 volts." Plaintiff said that the reason he did not walk the two and a half blocks was that he "had no jurisdiction over that and it (the meter box pole) was supposed to be a dead line and I didn't think it was any use to." Plaintiff also gave the above mentioned letter and what the city clerk told him as a reason for not walking the two and a half blocks. He also said that he had no knowledge of any service to be rendered from the line that extended south and west.

Plaintiff used expert witnesses on the appearance of the meter box pole. T. J. Reardon testified that he was an electrician and had been "engaged in the electrical work" for about 14 years; that he had "three years and maybe more" experience as a lineman. This witness was shown plaintiff's Exhibit 3, quite similar to the above exhibit, and the facts in evidence as to "pigtails" and other subjects were hypothetically detailed, and he testified that "from the indication in this picture . . . it would indicate the line is dead. . . . Yes, sir, looking at that picture, I would take hold of them," meaning the wires plaintiff grasped when injured.

Bland Rockwell testified that he had been "engaged in the electrical profession" about 15 years; that he had about 9 years experience "with high tension wires and line work." From the direct examination this appears: "Q. Mr. Rockwell, take this photograph marked plaintiff's exhibit 3, once more and assume that you

knew that there was a connection between these main transmission wires (BB and CC) and this pole which we have described, from the Wathena line to this pole, and assume you knew the juice came down the east side through the meter box, up the west side and then back toward the City of Elwood, and that thereafter those wires were cut off, the meter box was disconnected as shown in this photograph, and there were two little pigtail stubs hanging down from the two wires on the west side where they had been clipped off and hanging there, and then you walked up to that pole as in the photograph with knowledge I just mentioned, would you walk two or three blocks to trace out the line before you went upon the pole? A. No; as this photograph shows it, I would not.''

On cross-examination of witness Rockwell: ''Q. Now, presume that when you went to that pole, that you knew these two wires on the west side of this pole, these two drop wires (F and G) were a primary line and had been a primary line for twenty years; and presume you saw this primary line run west a block and off into town there; and presume that you did not know at the time you went there whether or not it was alive, do you understand what I mean? A. I, don't know. Q. Whether or not it was carrying current; and presume that you wanted to handle it, but did not know whether it was carrying current or not, would you, in order to find out whether it was carrying current or not, go up and take hold of the two ends of it? A. I would according to that photograph.''

Frank McAdams, electrician for Elwood and a witness for defendant, testified on cross-examination: ''Q. I will ask you now, if looking at that photograph (plaintiff's exhibit 3), if from all your experience, if that does not indicate to you that is a dead pole, would you not take that for a dead pole looking at that pole? Mr. Conkling: The question is whether the wires are alive or dead. Court: He can answer that. A. In a way it does, yes. Q. By 'dead pole' what do you mean? A. I mean all the high tension stuff dead on it. . . . Q. If there were little pigtails, wires hanging down from these wires, say six or eight inches unprotected, the average lineman seeing those pigtails hanging down would never dream there was any electricity in there, especially high tension wires? A. No. Q. As I understand it, the proper way to handle high tension wires is to dead end those wires? A. Yes, sir. Q. And not to leave them loose with pigtails hanging? A. That is the proper way.''

On cross-examination plaintiff said that his rubber gloves ''would have saved'' him from injury; that grasping the wires without rubber gloves was against the ''teaching and training'' of linemen, ''Q. In taking hold of these two wires and forming an arc or circuit between them, two primary wires with your bare hands, you violated every custom and practice and teaching that you linemen have in your business, didn't you? A. Well, there is two ways to answer

**42**

that. Q. Answer yes or no and then do all the explaining that you want. A. Yes, sir, I did that, but now when I went up this pole, that was supposed to be a dead wire and I took it for that, and for that reason didn't put my gloves on.''

Defendant introduced evidence of experienced linemen as to the custom and practice relative to the use of rubber gloves. Such evidence was to the general effect that linemen, without rubber gloves, did not take hold of electrical wires unless they *knew* such wires were dead. As expressed by one witness, ''never take hold of a wire with bare hand that you know nothing about.''

The value of the meter box was about $100 and it is reasonable that Bibbs and Sexton should have anticipated that Wathena would send some one to take the box from the pole, and in severing the connection at the meter box pole it was defendant's duty to exercise ordinary care to leave the pole in a reasonably safe condition so far as concerned removal of the meter box. But defendant contends that no act or omission on its part was the proximate cause of the injury, which is based upon the proposition that plaintiff and his experts testified that, absent the ''pigtails,'' an experienced electrician would not have thought F and G were dead wires. So that, if defendant left no condition which could have caused an experienced electrician to think wires F and G were dead, then the defendant, as a reasonably prudent person, would not have anticipated that plaintiff would go upon the pole and simultaneously take hold of the ends of two wires and thus cause injury to himself. It is true that only two witnesses, Sexton and Bibbs, testified as to the condition of the pole when defendant finished the work for the Doniphan Company. Sexton, who was plaintiff's witness, testified he cut wires F and G ''6 or 8 inches below the bottom crossarm and bent them back around the insulators to make it safe.'' Bibbs, defendant's witness, also testified that no ''pigtails'' were left, and that the wires were bent around the insulator. However, it was shown that in the interim between the severance complained of and the date of plaintiff's injuries, and on or about April 3 or 4, the city electrician of Elwood had been on the pole, and he testified he cut the wires leading from L and M to the filling station. It may or may not be significant that neither side saw fit to inquire of this witness as to whether or not there were ''pigtails'' dangling from the lower crossarm at wires F and G at the time he was on the pole on the date just mentioned. We do not understand the record to show that the ''pigtails'' were the *only* indication that the wires were dead. As plaintiff points out, none of the experts testified that the pole would not have appeared dead if there had been no ''pigtails.'' On the contrary, they testified that they would have taken hold of the wires because of the appearance of the pole as shown in the photograph, i. e., the wires connecting the electricity with the pole had been cut;

the wires on both sides of the pole leading to the meter had been cut; there was nothing being served off of the pole; the wires F and G were not cut at the top crossarm; *and* the "pigtails" were hanging down. Furthermore, the testimony of the witness Sexton that he did not leave the "pigtails" hanging down is not conclusive upon the plaintiff. The photographs of the pole, introduced by plaintiff, show the "pigtails" hanging down, and while it is true the photographs were not taken until several months after the date of the injury complained of, the plaintiff's witnesses testified to the effect that the photographs showed the condition of the pole at the time the plaintiff was injured. This, when taken in connection with the testimony of McAdams as to what he did on April 3 or 4—and there being nothing in his testimony from which it might be implied that he turned the "pigtails" down—is sufficient to give rise to the inference that there was no change in the condition of the pole between March 31 and April 7. We hold, therefore, on the first ground of the demurrer, that the question of defendant's negligence, under the facts, is one for the jury.

■ And we are also of the opinion that the evidence does not warrant finding as a matter of law that plaintiff was contributorily negligent. "Negligence is ordinarily a question for the jury. It is always so when the evidence on material points is conflicting, or where, the facts being undisputed, different minds might reasonably draw different conclusions from them. . . . If the inferences to be drawn from the evidence are not certain or incontrovertible, the question of negligence cannot be passed upon by the court." [Frese v. Wells (Mo.), 40 S. W. (2d) 652; Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509; Gratiot v. Mo. Pac. Ry. Co., 116 Mo. 450, 21 S. W. 1094, 16 L. R. A. 189.] The evidence as to the appearance of the meter box pole indicating the wires thereon were "dead" at the time plaintiff ascended the pole and was injured is sufficient to make the question of contributory negligence one for the jury.

■ This brings us to a consideration of Instruction 2, plaintiff's main instruction. It was unnecessarily long and involved, covers four pages of the abstract, and consists of a single sentence. The objections leveled against the instruction are that it purported to cover the whole case and directed a verdict but omitted a vital element of plaintiff's case, that is, it failed to require a finding that at the time the wires F and G were cut there were no wires attached to said wires F and G at the letters L and M and running to the filling station mentioned in evidence; and that it submitted a question of law. Plaintiff contends that said instruction did require the jury to find there were no wires leading to the filling station by the following language: "and if you also find from the evidence that it was the duty of said persons, who were in charge of, and who did said work, to discon-

nect said wires on the west side of said pole from the wires leading from said pole southward to the City of Elwood, and that they negligently failed to do so,'' etc. The court also gave Instruction F on the part of the defendant, by which the jury was ·instructed that if they found there were wires leading to the filling station, they should find for the defendant. And so it is argued that there was nothing to confuse or mislead the jury, and, therefore, the jury could not find that it was the duty of the defendant to cut the wires at the crossarm, unless it was found there were no wires leading to the filling station. We cannot agree with the reasoning of plaintiff that it is an insult to the intelligence of even the average juror to say to him that he did not understand that Instruction No. 2, as given, meant exactly what it would have meant if it had expressly told the jury to find for the plaintiff *''if they believed there were no wires leading to the filling station,* and it was the duty of the defendant to cut the wires at the top crossarm.''

The answer to this contention is found in that line of cases of which State ex rel. v. Ellison, 272 Mo. 571, 583, 199 S. W. 984, is typical. In that case it was said: ''Where an instruction for the plaintiff undertakes to cover the whole case, and where such instruction contains a direction to find for the plaintiff, provided the jury find the hypothetical facts mentioned in the instruction in plaintiff's favor, and where such instruction omits a hypothetical fact which must be found in favor of plaintiff before there can be a recovery, *then the omission of the last named hypothetical fact cannot be cured by any instruction given for the defendant. In such case, instead of the defendant's instruction curing the omission, it produces a conflict in the instructions.* This, because the plaintiff's instruction authorizes a verdict for plaintiff without any finding for plaintiff upon a vital question, and if the defendant's instruction requires a finding for plaintiff upon this vital question, before plaintiff is permitted to recover, then there is a conflict, which is both pointed and dangerous. Which instruction will the jury follow? The one for plaintiff which directs a verdict for her on the more limited question of facts, or the one for defendant which requires the finding of additional facts? Imagine an ordinary jury discussing the matter. Mr. A (on the jury) reads the defendant's instruction, and says, 'We can't find for plaintiff unless we find this fact,' but Mr. B (likewise on the jury) answers, 'Yes, we can, just read instruction numbered 1 for plaintiff. It tells us that we should find for plaintiff if we find these facts (reading the hypothetical facts), and says nothing about what you suggest.' *Thus the conflict is made* apparent.'' (Italics, the present writer's.)

In Macklin v. Fogel Construction Co., 326 Mo. 38, 31 S. W. (2d) 14, this court, in an opinion by the late Judge FRANK, was considering a like question. After citing with approval the doctrine of

State ex rel. v. Ellison, supra, said: "However, an instruction which omits to include, in express terms, all the elements necessary to a directed verdict, but nevertheless directs a verdict, is not erroneous if it properly refers to and incorporates within its terms, other given instructions which properly submit such omitted elements.

"It is claimed that the failure of plaintiff's instruction to submit the question of the validity of the release was cured by the giving of defendant's Instruction D-4 which did submit that question. The trouble with this contention is that plaintiff's instruction did not refer to defendant's Instruction D-4 in terms sufficient to make it a part of plaintiff's instruction, or to inform the jury that it must find the release invalid before a verdict for plaintiff was authorized. Plaintiff's instruction referred to 'other instructions in the case.' The other instructions to which plaintiff's instruction referred covered the questions of accident, contributory negligence, assumption of risk, burden of proof, validity of the release, etc. The lay mind would not understand from the general reference to all of these subjects, that the question of the validity or invalidity of the release should be selected therefrom and treated as a necessary element of plaintiff's case and decided in his favor before a verdict for him would be authorized. For the reasons stated, we hold that the giving of defendant's Instruction D-4 did not cure the error in plaintiff's Instruction No. 1."

In the case at bar, plaintiff's said main instruction made no reference to other instructions, and we think the ruling in the Macklin case where it was found that the reference "to other instructions in the case" was insufficient, is applicable to the more grievous defect (total want of reference to any other instruction) of the instruction here under scrutiny.

Moreover, we are of the opinion that the instruction is erroneous in that it submitted a question of law, i. e., whether it was the "duty" of defendant to disconnect the wires in the manner hypothesized, and thereby offended against a rule so well established as to require no citation of authorities.

It may be added that our conclusion touching this instruction has been reached by approaching the subject in the light of the authorities to the effect "that if error was committed, the trial court regarded it as prejudicial; . . . and though . . . the error pointed out . . . may not have been sufficient to reverse a judgment, yet in support of a judgment, we must presume that the court with its better knowledge of the trial, and the effect the error may have had upon the result, acted accordingly" in sustaining the motion for new trial. [Bunyan v. Citizens' Ry. Co., 127 Mo. 12, 29 S. W. 824. See, also, Hoepper v. Southern Hotel Co., 142 Mo. 378, 44 S. W. 257; Ittner v. Hughes, 133 Mo. 679, 34 S. W. 1110; Stafford v. Ryan (Mo.), 276 S. W. 636, Wolfson v. Cohen (Mo.), 55 S. W. (2d) 677.]

From what has been said it follows that the order and judgment granting a new trial should be affirmed, and the cause remanded. It is so ordered. All concur, except *Clark, J.*, not sitting, and *Gantt, J.*, absent.