Sidney PARKER, Administrator of Estate of Mildred L. Parker, Deceased, et al., Plaintiffs,

v.

STERN BROTHERS & COMPANY, a corporation, Defendant-Third Party Plaintiff-Respondent,

v.

William C. LUCAS, Jr., et al., Third Party Defendants-Appellants.

No. 57059.

Supreme Court of Missouri, Division No. 1.

Sept. 10, 1973.

Rehearing Denied Oct. 8, 1973.

Lawrence M. Berkowitz, Dick H. Woods, Kansas City, for respondent Stern Brothers

& Company, a Corporation; Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, of counsel.

H. George Lafferty, Jr., Kansas City, for appellant William C. Lucas, Jr.

James H. Ottman, William G. Zimmerman, Kansas City, for appellant Empire District Investment Co., Inc., a Corporation.

WELBORN, Commissioner.

Stern Brothers & Company was sued in six separate actions on the theory that Stern Brothers had refused to purchase stock in six Missouri banks, contrary to its offer to do so as an agent for an undisclosed principal. Four of the suits were in the United States District Court and two in the Jackson County Circuit Court. Stern Brothers filed third party actions in all six cases against William C. Lucas, Jr., Beulah Lucas, the mother of William, Jr., and Empire District Investment Company, Inc., for indemnity against any loss by Stern Brothers to the plaintiffs on the theory that Stern Brothers acted, in the transactions involved, as agent of the named third party defendants.

In December, 1970, Stern Brothers settled the six suits for $170,000. Trial was then had of the third party claims in the two circuit court actions, which were consolidated. One of the actions involved the claim originally filed by Sidney Parker, Administrator, which sought judgment against Stern Brothers for $441,599.83. The jury in the third party action returned a verdict in favor of Stern Brothers and against William C. Lucas, Jr., and Empire for $91,822. The second action involved the claim of Sidney Parker, individually, which sought judgment of $39,464.66 against Stern Brothers. The verdict in the third party action was in favor of Stern Brothers and against William Lucas, Jr., and Empire for $8,178. After their after-trial motions had been overruled, Lucas and Empire appealed to this court by notice of appeal filed June 29, 1971.

This litigation centers around the holdings of various members of the Lucas family in six Missouri banks: The Osceola Bank, Humansville Bank, Lowry City Bank, Tri-County State Bank, El Dorado Springs, Citizens State Bank, Fair Play, and Citizens Bank, Appleton City. William C. Lucas, Jr., inherited stock in each of the banks from his father, William C. Lucas. The stock which William Lucas, Jr., inherited averaged about 8% of the outstanding stock in the banks. Judge John Lucas, a half-brother of William C., Jr., and his son owned some 20% of the stock in each of the five banks, other than the Appleton City bank, where his holdings amounted to 5 or 10%. The Linney branch of the family, which stemmed from Lula Lucas Linney, the sister of W. C. Lucas, Sr., owned about 30% of the stock except for Appleton City, where their holdings were approximately 15%. Similar holdings were in the hands of the Terwilligers, who stemmed from Sophia Lucas Terwilliger, also a sister of W. C. Lucas, Sr.

Stern Brothers & Company is a Kansas City investment banking corporation. Raymond F. Davis has been an assistant vice-president of the company since 1953 or 1954. He became acquainted with William C. Lucas, Jr., in 1961. In 1963, Lucas purchased 100 shares of National Fidelity Life Insurance Company stock through Davis and Stern Brothers. In December, 1964, Lucas asked Davis to call some persons owning stock in the Appleton City Citizens State Bank to see whether they would sell their stock. Lucas instructed Davis not to reveal who was interested in buying. Davis was unable to find any sellers.

In August, 1967, Lucas came to Davis's office with a letter which he had prepared and which he asked Davis to send out on Stern Brothers stationery. According to Davis, Lucas told him that "a group or a syndicate of people" wanted to buy stock of the banks referred to in the letter. Davis stated that Lucas assured him "there would be no problem" about money. Lucas

asked that the letter be sent to Mrs. Sophia L. Terwilliger of Colorado Springs, Colorado, Elston Merryfield, Appleton City, Lottie and Doris Scroggs, Clinton, and Frank and Edith Suchomel of Center Point, Iowa. Following substantially the draft submitted by Lucas, Davis, under date of August 17, 1967, sent, on Stern Brothers stationery, the following letter to the persons whom Lucas had designated:

"We hold offers to buy stock in the banks at Eldorado Springs, Fairplay, Humansville, Appleton City, Lowry City, and Osceola, Missouri. The offering prices vary from twice the book value at the smaller of these institutions to a high of two and one-half times the book value at Appleton City.

I have not quoted exact dollar prices to you since these are tied to book value which, from time to time, may fluctuate. The orders to buy are open for five years, expiring on this date in 1972. The actual dollar price would be set as of the exact date of receipt of acceptance at this office and then by certified statement as to the book value given to us by the cashier of the bank.

I would appreciate your interest in this matter to the extent of conveying this offer to other members of your family. The offer itself is general and open thus not subject to rejection as circumstances may change for you during the next five years.

Very truly yours,

Ray F. Davis
Assistant Vice President"

Lucas instructed Davis that he could not reveal who was buying the stock. Davis was not then aware that as agent for an undisclosed principal Stern Brothers might be liable to accept any stock tendered in response to the offer.

Davis heard nothing from the offer. He received occasional inquiries from Lucas as to whether anything had come in.

In late April or early May, 1968, a Mrs. Hahn of the Internal Revenue Service came to Davis's office with a copy of the August 17 letter addressed to Mrs. Terwilliger. Mrs. Hahn informed Davis that Mrs. Terwilliger had died and the Internal Revenue Service was interested in finding out, for estate tax valuation purposes, whether or not the August 17 letter represented a bona fide offer. Davis informed her: " * * * to the best of my knowledge this offer was open, that there was no money in escrow, that a group of people were trying to buy stock, that I thought that stock would be picked up, if tendered, and to call Mr. William C. Lucas for any further information."

Immediately following Mrs. Hahn's visit, Davis called Lucas and told him about the visit and Mrs. Hahn's inquiry and that he had told her that the August 17 letter represented a bona fide offer. Lucas thanked Davis for calling.

On June 10, 1968, Davis received a call from Mr. Fred Murdock, a Kansas City attorney, asking for an appointment about the August 17 letter. Murdock came to Davis's office that afternoon. Prior to his arrival, Davis had called Lucas and told him that Murdock was coming over in the interest of clients whom he did not identify. Lucas told Davis, "Don't let them know who is buying stock." He also said, "Let's see what they've got." Murdock was accompanied by Mr. Sidney Parker and his daughter, Margaret Parker Platter. (The Parkers are of the Linney branch of the Lucas family.) They asked Davis whom Stern Brothers was representing and he told them "it was a group or syndicate of people" and did not divulge Lucas's name. Murdock produced an authorization from Judge John Lucas and his son, John Lucas, Jr., to reveal whether or not they were the principals involved and Davis stated they were not. According to Davis:

" * * * The primary thing that I thought that they were concerned with was the estate valuation that was being placed

on the stock in two estates by the Internal Revenue Service which was brought about by the letter of August 17, which the Internal Revenue Service had. And these people thought that this was a price far in excess of fair market value. In the discussion, Mr. Murdock asked me about the conditions of this letter; I told him that insofar as I knew, that this group of people would pick up any stock that was tendered, that there was no money in escrow, but that I believed the parties to be responsible. There was further discussion in this regarding the probability of who the people might be that were trying to buy stock, and it was my impression, by comments that were made by Mr. Parker and Mr. Murdock, that they were going to call on Bill Lucas. When they left, I immediately called Bill Lucas and related what I have told you."

Davis stated that he told Lucas "they would probably call on him." Lucas replied, "This was fine." He told Davis "just to sit back and see what they had to offer."

The next day Lucas appeared at Davis's office, with a handwritten letter from his mother, addressed to Davis, which referred to her wish, previously transmitted to Davis, to purchase "any or all stock owned by members of the Lucas family in the various country banks." The letter stated that she would buy or William Lucas would sell on the terms given Davis. A copy of the letter was made and delivered by Lucas to Murdock.

Around June 13, 1968, Lucas got in touch with Mr. Delton Houtchens, an attorney at Clinton. Between June 13 and July 3, 1968, correspondence took place between Houtchens and Murdock relating to Lucas's willingness to negotiate with Murdock's clients on a different basis, and expressing an intent on the part of Lucas to exchange stock in return for a controlling interest in the Appleton City bank.

On July 1, 1968, Sidney Parker wrote to Stern Brothers "Attention: Mr. Richard J. Stern, President," as follows:

"I am the Administrator of the estate of Mildred L. Parker, deceased, which estate is the owner of stock in the banks mentioned in your letter of August 17, 1967 directed to Mrs. Sophia L. Terwilliger and signed on behalf of your Company by Mr. Ray F. Davis, Assistant Vice President, a copy of which letter is enclosed. On June 10, 1968, accompanied by my daughter, Margaret Parker Platter, and Mr. Fred A. Murdock, I called at your office and discussed that letter with Mr. Ray F. Davis who represented to us that all of the representations contained therein were true and that the offer was open to any and all shareholders of any of the banks mentioned in that letter and that there were no conditions not set out therein which would affect that offer prior to its expiration date on August 17, 1972. Mr. Davis represented to us that any shareholder could at any time during that period tender any amount of stocks in those particular banks and would receive pay therefor in accordance with the formula set out in your August 17, 1967 letter. Mr. Davis informed us that although there was no money in escrow or on deposit to pay for any shares of stock which were tendered in accordance with that offer, that there was absolutely no question that the money would be forthcoming upon a tender of the stock. That letter addressed to Mrs. Terwilliger has been widely circulated and it is probable that all of the shareholders in the banks named therein, as well as myself, will necessarily rely upon representations made in that letter and by Mr. Davis, on June 10, 1968, in all matters affecting the ownership of shares of stock in those banks. This letter is written to you in order that you may be on notice that my daughter and I, and probably many of the other shareholders, will rely upon those affirmative representations made by your Company."

The letter was handed to Davis, inasmuch as Richard Stern was out of town. Davis received the letter on July 3. He

called Lucas. "I read this letter to him, I told him there are a lot of things in the letter that are Mr. Murdock's wording, they are not mine, but I did read the letter to him and I told him that I was going to answer the letter, stating that so far as I knew that it was generally true, that Stern Brothers was not a principal, that we were acting as an agent. And I believe Bill's exact comment was, 'Good. Let's see what they've got.'" After discussing his reply with Lucas, Davis wrote the following letter to Parker:

"Your letter of July 1, 1968, regarding the purchase of certain bank stocks has been referred to me. Representations that were made on June 10, 1968, are, to the best of my knowledge, true and correct. On that date we were acting as agents for clients who wished to purchase stocks of these banks as outlined in my letter of August 17, 1967.

My company has no interest in acquiring any of these stocks, nor is it acting as principal in this transaction, but as an agent for interested purchasers."

He sent Lucas a copy of Parker's letter and of his reply.

The next relevant occurrence was the receipt by Davis of a letter dated August 28, 1968, from Mrs. B. F. Barnett of Tyler, Texas. The letter, addressed to Stern Brothers, "Attention: Mr. Ray F. Davis, Assistant Vice President," was, in part, as follows:

"I expect through the distribution of my mother's estate shortly to become the owner of stocks in banks in the following cities and in approximately the number of shares set out opposite the cities below:

| | |
|---|---|
| Appleton City | 162–1/3 |
| Osceola | 35.83 |
| Fair Play | 1–2/3 |
| Lowry City | 24–1/2 |
| Humansville | 18–2/3 |
| El Dorado | 35.083 |

It is possible that distribution from the estate may make small variances in the number of shares shown above.

As soon as distribution is made, it is my intention to tender these shares to you to be purchased as set out in the commitment letter dated August 17, 1967 to my aunt, Mrs. Sophia L. Terwilliger of Colorado Springs, Colorado."

Davis called Lucas and told him of the letter. Lucas replied: "The next move is up to them." Davis sent Lucas a copy of Mrs. Barnett's letter.

On Friday, September 13, 1968, Murdock called Davis and told him that he had bank stock to deliver to Stern Brothers. Davis was not going to be in the office late that afternoon and he arranged for the receipt of the stock. Davis told Lucas of Murdock's call and Lucas told him "we would have to wait and see what they wanted." Davis arranged for Lucas to call another Stern Brothers representative about the stock which was delivered and Lucas did so.

Late on the afternoon of September 13, Murdock delivered to Stern Brothers stock in the six banks on behalf of Sidney Parker, Sidney Parker, Administrator of the Estate of Mildred Linney Parker, Mrs. Margaret Parker Platter, Mrs. Mary Nanon Linney Barnett, Mrs. Bertha Linney Elstner, and her children, Mrs. Linda Ann Elstner Merrell and Leonard Stuart Elstner, Jr. Each of the letters of transmittal recited that the stock was delivered "in acceptance of your offer to shareholders as expressed in your letter dated August 17, 1967 addressed to Mrs. Sophia L. Terwilliger * * *."

On Monday, September 16, Lucas came to Davis's office. He told Davis that he figured that the stock which had been delivered amounted to about $900,000, according to his valuation. He asked Davis to call Murdock and get the banks' daily statements for September 13. Davis did so and Murdock furnished the information,

which Davis passed on to Lucas. Davis saw Lucas "two or three times right in here real quick; he was trying to make bank loans with banks to see if he could pick up this stock."

Sometime around September 19 or 20, Lucas brought to Davis a letter, signed by Lucas, on stationery of Empire District Investment Company, Inc., tendering to Stern Brothers stock in the banks in question, standing in the name of Empire District and Lucas. The letter recited that the shares were tendered "pursuant to your letter of August 17, 1967, to Mrs. Sophia L. Terwilliger." The letter stated: "I understand that the interest shown in August of 1967 was confined to those shares owned by Mrs. Terwilliger and her family since, although I was her nephew, neither she nor any member of her family informed me of the contents of your letter."

Sometime that week, Lucas brought to Davis two documents which he had prepared. One, on the Empire letterhead, was for the offer for sale, at a price specified, all of the stock which had been received by Stern Brothers except that in the Appleton City bank. Davis refused to send out such a document because the stock that had come in hadn't been paid for. Lucas also submitted a draft of a letter which he proposed that Davis write to heirs of Mrs. Terwilliger, offering to sell the deposited stock, except in the Appleton City bank, in accordance with the August 17, 1967 letter to Mrs. Terwilliger, and offering to sell any stock in the banks which the Terwilligers might wish to submit. Davis declined to send such a letter.

About September 24, Lucas appeared in Davis's office with drafts of a letter to be written by Davis to Murdock. The purport of the proposed letter would have been to limit the prior offers to proposals to sell, to be accepted or rejected by the "interested purchasers." The letter would have accepted the Appleton City stock which had been tendered, purportedly according to a letter of Murdock, dated June 24, 1968, to Houtchens, asking for a definite proposal. Davis refused to send either of the drafts submitted because of factual errors in their content.

On September 25, Lucas brought Davis a note, on Empire's letterhead, requesting that a confirmation on the Appleton City stock be obtained from Murdock as soon as possible and sent to "Customer Accounts, ATT: Mr. Ralph Dye, Traders National Bank." The letter stated: "If the sellers seem to be reluctant to do anything that we may reasonably want, don't give them cause to back out but simply say you'll have to consult with the people who are interested in the stock."

Lucas also brought a draft of a letter, to be sent to Murdock, advising that funds were available for the purchase of 487 shares of Appleton City stock, and offering to purchase several odd lots in the remaining five banks. Davis declined to send the letter, but did call Murdock and tried to make a deal for Lucas to purchase the Appleton City stock and the odd lots in the other banks. Murdock informed Davis that he had "delivered all of the stocks to Stern Brothers and he wanted payment on all of them, not just a portion."

On September 27, Davis received a letter from Murdock, addressed to Stern Brothers, demanding payment for all the stock he had submitted on behalf of his clients and enclosing a computation of the book value of the stock in each of the banks. Davis sent a copy of the letter to Lucas, and asked him to let Davis know "our next step."

On October 3, at Davis's request, Lucas came to Stern Brothers to talk to Davis and other Stern Brothers officials. He brought three letters which he asked Davis to place in his file and say he had previously overlooked, but Davis refused to do so. A conference followed between Lucas, Davis, Mr. Richard Stern, Mr. Gumbiner and two Stern Brothers attorneys. Lucas stated that he was not going to "pick up" the stock. According to Davis: "He [Lu-

cas] did tell Mr. Stern that he had written the letter of August the 17th, that he had talked to me on occasions, that he had received the information after the Murdock visit and that he had talked to me and received the correspondence of the Parker letter of July 1st. He also mentioned a Delton Houtchens and some correspondence that Mr. Houtchens had sent out, which I didn't really understand, but apparently Mr. Houtchens was trying to buy stock at the same time I was, for Mr. Lucas."

Stern delivered to Lucas a letter signed by Stern as President of Stern Brothers, reciting the delivery of the stock by Murdock and demanding $1,070,902.20 to pay for the stock, and advising Lucas that if payment was not forthcoming, Stern Brothers would look to him for "indemnification against all loss and expense." On October 16, 1968, a similar letter was written to Mrs. Beulah Lucas.

Lucas delivered to Mr. Stern a letter from Lucas addressed to Davis, purporting to outline the course of the entire transaction.

On October 7, Lucas wrote Stern Brothers that in view of their letter of October 4, "your company and all of the individuals connected with your company are no longer authorized to sell or purchase any stocks of any kind, either on my behalf or on behalf of my mother, Mrs. Beulah Lucas or on behalf of the Empire District Investment Company, Inc. It is clear that the instructions given to your company by Mrs. Lucas, the Empire District Investment Company, Inc. and myself have not been followed: * * *."

In October, Stern Brothers wrote other stockholders of the banks, advising them that Stern Brothers would not accept tenders "purporting to be made pursuant to letters dated August 17, 1967 and July 3, 1967 (sic) signed by Ray F. Davis, who had no authority to write such letters on behalf of Stern Brothers & Company."

On October 22, Richard Stern wrote Murdock, offering to return the stock Murdock had delivered. In the course of the letter Stern stated: "In our opinion the only persons liable for the purchase price of said stocks are William C. Lucas, Jr., and his mother, Mrs. William C. Lucas." Murdock refused to accept the return of the stock.

On October 31, 1968, William L. Elder as Executive Vice President of Empire addressed a letter to Stern Brothers:

"You have previously been handed certain stock certificates which are the property of Empire District Investment Company, Inc., and you are hereby requested to return said stock certificates immediately to the company.

In addition, this is to notify you that your company is no longer authorized to act on behalf of the Empire District Investment Company, Inc. nor are any of your employees or officers authorized to act on behalf of the company in either the sale or purchase of any stock certificates of any kind."

The persons who had tendered their stock filed suit in April, 1969, for the purchase price of their stock. Stern Brothers filed third party actions against Lucas, his mother and Empire in each case. On November 12, 1970, the third party defendants were afforded the opportunity to settle the six cases for $185,000. They declined the offer and on December 10, 1970, Stern Brothers settled the six cases for $170,000, of which $7,395 went to Sidney Parker individually and $82,807 to Parker as Administrator of the Estate of Mildred L. Parker. The stock deposited by the plaintiffs was returned to them. Demand was made on the third party defendants for reimbursement in that amount, plus attorneys' fees and expenses. Stern Brothers paid $30,840 attorneys' fees for defense of all six cases and $6,092.35 for expenses in all six cases. Trial of the third party claims in the cases involving the Parkers resulted in judgments against William C. Lucas and

Empire for $91,822 on the administrator's claim and $8,178 on the individual claim. Beulah Lucas had not been served in the case involving the claim of Parker as administrator, and had been dismissed as a party to that cause before trial. The jury found in favor of Beulah in the case involving the individual claim of Parker. Third party defendants W. C. Lucas, Jr., and Empire appealed.

■ Appellants attack the respondent's verdict-directing Instructions Nos. 5 and 7 on the grounds that they fail to identify the ultimate issue of fact, are vague, misleading and confusing, and give the jury a roving commission to find appellants liable for any and all "actions," "occurrences" or "occurrence" in evidence. The instructions are also attacked on the grounds that they failed to submit the essential issue of Davis's agency for Stern Brothers.

Three verdict-directing instructions were given on behalf of respondent.

Instruction No. 5 read:

"You must find for third party plaintiff Stern Brothers & Co. and against the third party defendant William C. Lucas, Jr., if you believe:

First, that Stern Brothers & Co. took *actions* on behalf of third party defendant William C. Lucas, Jr., within the scope and course of an agency relationship, and

Second, that as a result of such *actions* of Stern Brothers & Co. taken on behalf of William C. Lucas, Jr., Stern Brothers & Co. was sued by Sidney Parker, both individually and as administrator of the estate of Mildred Parker, and

Third, that in connection with the lawsuits by Sidney Parker, individually and as administrator against Stern Brothers & Co., it paid the said Sidney Parker, individually, the sum of $7,395, and as administrator of the estate of Mildred Parker, the sum of $82,807 pursuant to an agreement for the settlement of his

claims against Stern Brothers & Co. in such lawsuits and incurred attorney's fees and expenses in defending against such claims, and

Fourth, that all or any part of such settlements, attorney's fees or expenses so incurred by Stern Brothers & Co. were reasonable." (emphasis added)

Instruction No. 7 read, in part:

"You must find for the third party plaintiff Stern Brothers & Co. and against third party defendant Empire District Investment Company, Inc., if you believe:

First, that William C. Lucas, Jr. *acted* in regard to Stern Brothers & Co. in the *occurrences* mentioned in evidence on behalf of Empire District Investment Company, Inc. within the scope and course of an agency relationship, and

Second, that because of the *actions* of William C. Lucas, Jr. taken on behalf of Empire District Investment Company, Inc., Stern Brothers & Co. was sued by Sidney Parker, individually and as administrator of the estate of Mildred Parker, and * * *." (emphasis added)

Paragraphs "Third" and "Fourth" of Instruction No. 7 were the same as in Instruction No. 5.

Instruction No. 9 read, in part:

"You must find for third party plaintiff Stern Brothers & Co. and against third party defendant Beulah Lucas in Case No. 725,184 if you believe:

First, that William C. Lucas, Jr. *acted* in regard to Stern Brothers & Co. in the *occurrence* mentioned in evidence on behalf of Beulah Lucas within the scope and course of an agency relationship, and

Second, that because of the *actions* of William C. Lucas, Jr., taken on behalf of Beulah Lucas, Stern Brothers & Co. was sued by Sidney Parker, individually, and * * *." (emphasis added)

Paragraphs "Third" and "Fourth" of Instruction No. 9 were the same as paragraphs "Third" and "Fourth" of Instructions Nos. 5 and 7, except that the reference to the payment to Sidney Parker, Administrator, was omitted, the claim against Beulah on that claim having been dismissed.

Appellants attack the use of the italicized words "actions" in Instruction No. 5, "acted," "occurrences" and "actions" in Instruction No. 7, and also point to the words "acted," "occurrence" and "actions" in Instruction No. 9. Appellants assert that the central issue in the cases was whether or not Stern Brothers, as agent for undisclosed principals, made a binding offer to buy stock in six Missouri banks, but that none of the verdict-directing instructions referred to any alleged offer to buy stock. They contend that the use of the terms "actions," "occurrences," etc., did not define and submit the ultimate fact issue involved in the cases.

■ The instructions involved are not found in MAI. Rule 70.01(e), V.A.M.R., requires that a non-MAI instruction be "simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." The requirements of this rule are not intended to supplant the basic function of a verdict-directing instruction, which is to submit to the jury the factual questions which they must resolve.

There were factual issues in this case. The recital of facts above set forth is generally favorable to the verdict and in favor of the respondent. However, the testimony of Davis and of Lucas was completely opposite on numerous matters. The basic position of Lucas was that the August 17, 1967 letter was intended only for the Terwilliger family and the persons to whom the letter was sent and that he was interested only in a limited number of shares. Lucas testified that when Davis discussed the Murdock-Parker visit of June 10, 1968, he told Davis that he could not understand why the Parkers were concerned, that the letter was not addressed to Parker or to the Linney family. "It was directed to Mrs. Terwilliger and her family and that was all." He told Davis that he would see what he could do "to terminate any sort of misconceptions or problems that Mr. Murdock or Mr. Parker had." Lucas testified that he told Davis that if they needed money to pay the inheritance tax, "I might be interested in a little of their stock." "I told Mr. Davis that I was willing to wait and see what they had to offer, but not on the basis of any prior negotiations or anything that he had said in a letter or that I had said through him in a letter to Mrs. Terwilliger."

There was some question as to what Davis told Murdock and Parker. Davis said that he did not recall that he told Murdock and Parker that the offer of August 17 "was open to any and all shareholders of all the banks." Lucas at one time stated that he thought Davis "did say they wondered if this letter applied to them and I said 'No.'". Later he stated that Davis did not tell him that "he had told them or left them to understand in any way that this letter of August 17, 1967, was open and general to them, which it was not."

Davis testified that he did not confirm the statement in the Parker July 1 letter until after he had talked to Lucas, which he did prior to writing his letter of July 3. Lucas testified that he was out of town on July 3 and did not return until after July 4. He testified that Davis did not discuss the July 3 letter with him before it was written.

Referring to Instruction No. 5, the basic question submitted was whether or not the actions of Stern Brothers which resulted in their being sued were taken in the course of an agency relationship between Lucas and Stern Brothers. There was no real dispute as to the actions which resulted in the suit, to-wit, the Terwilliger letter, the conference with Mrs. Hahn, the conference

with Murdock and Parker, the Parker letter and Stern Brothers' reply, Mrs. Barnett's letter, the delivery of the stock to Stern Brothers and Lucas's refusal to take up the stock. Therefore, there was no necessity to submit to the jury instructions specifying the actions involved. Gottlieb v. Hyken, 448 S.W.2d 617, 620 (Mo.1970); Brittain v. Clark, 462 S.W.2d 153, 155 (Mo.App.1970). Appellants argue that because the instruction did not limit the "actions" to those which resulted in a binding offer to buy stock, the instruction was misleading and gave the jury a roving commission, to consider, appellants assert, such actions between Lucas and Stern as the 1965 stock purchase by Lucas through Stern, the efforts to obtain bank stock in 1965, the Houtchens-Murdock correspondence, etc. The answer to that argument is that no suggestion or contention was made whatsoever that such actions resulted in the lawsuits against Stern Brothers. The jury was fully aware that the lawsuits involved the August, 1967 letter and subsequent actions which led eventually to the tender of stock. Addition of the words in the instruction to relate the "actions" to "a binding offer to buy stock" would not have clarified the issues in any manner. The factual issues related not to what "actions" were taken but to whether or not Lucas authorized or ratified Stern Brothers' actions. The instruction did limit the actions to those which resulted in Stern Brothers being sued. The ultimate facts were adequately submitted. Williams v. Ford Motor Company, 411 S.W.2d 443, 450 [7, 8] (Mo.App.1966).

The case of Buffington v. Fairground Sales Company, 402 S.W.2d 59 (Mo.App. 1966) is not here applicable. The real defect in the instruction there considered was its failure to define which of two possible theories of action plaintiff relied upon. The court did criticize as a submission of a claim based upon false representations a verdict-directing instruction which described the representations relied upon as "certain representations." MAI No. 23.05

requires the representations relied upon to be stated specifically. This is in accord with the requirement of Rule 55.17 requiring averments of fraud to "be stated with particularity." The instruction here adequately submitted the ultimate factual issues which the jury were required to resolve.

Appellants attack Instruction No. 7 on the grounds that the terms "actions," "acted" and "occurrences mentioned in evidence" are misleading and confusing. The actions and occurrences in issue did not require further elaboration. They clearly and indisputably referred to an offer to buy stock so that there was no necessity so to limit the actions and occurrences.

Appellants assert that the confusion from the use of the term "occurrences mentioned in evidence" is shown by the fact that in Instruction No. 9, on which the jury returned a verdict in favor of Beulah Lucas, the instruction refers to "the occurrence mentioned in evidence." Speculation as to why the jury found in favor of Mrs. Lucas would be meaningless. No reasonable hypothesis has been suggested which would explain the verdict in her favor and against Empire because in her case the instruction used the singular "occurrence" whereas in Empire's case the instruction used the plural "occurrences" and the difference in the instructions does not demonstrate that Instruction No. 7 was confusing or misleading.

Appellants also attack Instructions Nos. 5 and 7 on the grounds that they failed to submit an element essential to recovery by Stern Brothers, i. e., the issue of Davis's agency with Stern Brothers.

In some of their early dealings with the original plaintiffs, Stern Brothers did deny Davis's authority to make the August 17 offer on behalf of Stern Brothers. Davis was, however, admittedly an assistant vice-president of Stern Brothers and by settling the claims of the original plaintiffs, Stern Brothers accepted responsibility for his acts. The pleadings in the third

party proceeding make no issue of Davis's agency. The third party petitions make no such averment and the defendants' answers raise no issue in that regard. In fact, the counterclaim of third party defendant William C. Lucas, Jr., affirmatively asserts Davis's agency for Stern Brothers. In these circumstances, the agency of Davis was not a controverted issue, required to be submitted to the jury.

▮ Appellant Empire also attacks Instruction No. 7 on the grounds that it submits only that Lucas acted as its agent, and does not submit the issue of Stern Brothers' agency for Empire. Empire argues that the instruction thereby omitted an essential element of recovery against it. Empire asserts that, since Instruction No. 7 was a verdict-directing instruction as to it, reference cannot be had to Instruction No. 5, as suggested by respondent, to supply the element of an agency relation between Empire and Stern Brothers. Empire argues that an omission from a verdict-directing instruction may not be supplied by other instructions, citing Brozovich v. Brozovich, 429 S.W.2d 330 (Mo. App.1968), and Milliken v. Trianon Hotel Company, 364 S.W.2d 71 (Mo.App.1962).

The rule relied upon by Empire is that which prohibits reference to a defendant's instruction to supply a basic issue omitted from a plaintiff's verdict-directing instruction. Brozovich relies upon Milliken which in turn relies upon McDaniel v. McDaniel, 305 S.W.2d 461 (Mo.banc 1957). McDaniel makes clear that the rule is based upon the conflict which results when a defendant's instruction supplies the element missing from plaintiff's verdict-director. 305 S.W.2d 467 [6, 7]. See Thompson v. St. Joseph Ry., Light, Heat & Power Co., 345 Mo. 31, 131 S.W.2d 574, 581–582 [5]–[7] (Banc 1939).

There is no problem of conflict here where the two instructions relate to the separate liability of two defendants. In order to find against Lucas, the jury had to find under Instruction No. 5 that he act-ed in an agency relation with Stern Brothers. By its finding Lucas liable, that essential finding had been made and the question of Empire's liability then depended upon whether or not Lucas also acted as an agent for Empire. That issue was submitted in Instruction No. 7. The charge as a whole adequately submitted the issues required to be determined and the failure to submit the Empire-Stern Brothers relationship in Instruction No. 7 was not error.

Appellants attack Instructions Nos. 3, 4, 5 and 7 on the grounds that they fail to identify who is principal and who is agent and are thus vague, misleading and confusing. The instructions are also attacked on the grounds that they are mere abstract statements of law. Instruction No. 3, given as a modification of MAI No. 13.06, read:

"Acts were within the 'scope and course of agency' as that term is used in these instructions if:

1. They were performed by an agent to serve the interests of a principal according to an express or implied agreement with the principal, and

2. The principal either controlled or had the right to control the conduct of the agent."

Instruction No. 4 read:

" 'Implied agreement with the principal' as that term is used in Instruction No. 3 means that derived from the conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. Said conduct may consist of a principal's failure to object to unauthorized conduct by an agent."

MAI No. 13.06 contemplates that when such instruction is used, the name of the principal and of the agent shall be inserted, rather than employing the term "an agent" or "a principal" as was done here. However, as apparent from the discussion of the last point, there were two agency relationships involved in this case. In one Lu-

cas was the principal and Stern Brothers the agent. In the other Lucas was the agent and Empire the principal. Also submitted was the relationship between Lucas and his mother. Three separate definitions, naming the principal and agent in each situation, might have been given. Such repetition was avoided by a single instruction which adequately defined the relationship which the jury were required to find under each of the verdict-directing instructions. Without naming the principal or agent, the instruction given in using the terms "agent" and "principal" did not employ terminology beyond the scope of the understanding of the average juror.

The objection that Instructions Nos. 3 and 4 are merely abstract statements of law is without merit. They were definition instructions, involving some abstractness. See MAI "Definitions," Series 11.-00, 13.00, 14.00, 15.00 and 16.00. Unlike the instructions condemned in Skain v. Weldon, 422 S.W.2d 271 (Mo.1967), relied upon by appellants, the instructions do have "specific relevance to [a] determinative fact or issue directly involved in the trial of the merits of this cause." 422 S.W.2d 273. The language of the instructions evidences this distinction.

◼ Appellants attack the inclusion of attorneys' fees and expenses as elements of damages submitted to the jury by respondent's instruction. Appellants assert that there was no evidence to support such submission because there was no evidence of the amount of attorneys' fees and expenses applicable to these two cases.

Respondent's evidence showed that their attorneys had spent 993.50 hours in all six cases in defending the six original plaintiffs' claims; that respondent had paid $30,840 to its attorneys for their services in all six cases; that the reasonable charges for the services in all six cases would have been $34,000 to $36,000. There was also evidence that Stern Brothers had paid $6,092.35 for expenses in the six cases. Appellants argue that, since there was no evidence on which to base an allocation of attorneys' fees and expenses for the two cases here involved, the jury's award in that respect could only be based on speculation. The verdicts in the two cases amounted to some $9,798 more than Stern Brothers had paid in settlement of the claims of the original plaintiffs in these two cases.

Mr. Richard Stern, President of Stern Brothers, testified that Stern Brothers was seeking in these actions reimbursement for the "proportionate part of the expenses of defending against the two actions." Mr. Carl Enggas, a Kansas City attorney, testified to the reasonable value of the legal services rendered. On the question of allocation of the fees among the six cases, he stated:

"My experience has been when you have a group of lawsuits, whenever you work on one you have to give consideration to the others, because if you answer interrogatories in one case, whether it be even in the same state, if you answer wrong in that case, it will fly up and hit you in the face in the state court case, so they are all interrelated."

This evidence would authorize the jury to allocate to these cases an amount equal to one third of the attorneys' fees and expenses paid and was sufficient to justify submission of the issue to the jury. The case of Girratono v. Kansas City Public Service Co., 243 S.W.2d 539 (Mo.App. 1951), aff'd, 363 Mo. 359, 251 S.W.2d 59 (1952), involved submission of medical expenses in a case in which there was no evidence of the charge of one of the physicians or the reasonableness of the amount. In such case, the submission of plaintiff's medical expenses as an element of damages was erroneous because there was no evidence to support the submission. Here there was evidence to support submission of the issue of damages for attorneys' fees and expenses.

◼ The next point raised is that a directed verdict in favor of Empire should

have been ordered at the close of the case because there was insufficient evidence to sustain a finding that Lucas acted as Empire's agent in respect to the offer to buy stock.

Empire District Investment Company was a Kansas corporation, incorporated February 12, 1965. Lucas was one of the three incorporators. On November 17, 1965, Lucas wrote the Tri-County State Bank and submitted the shares in that bank in his name with directions to reissue the shares in two certificates, one to Lucas in an amount sufficient to permit him to qualify as a director and the other to Empire. Attached to the letter was a note signed by Lucas: "Thought you'd better know that I control the Empire District Investment Co." The 1968 annual report of the corporation filed with the State of Kansas in 1969 showed Lucas as president. The report also showed him the owner of 25% of the stock of Empire. Lucas said this was an error as all of his shares had been transferred to trustees for his children by 1967.

Davis testified that Lucas told him that a group of people were interested in buying the stock. In September, 1968, when Lucas submitted stock in the six banks to Stern Brothers, he submitted the shares in his name and also those standing in the name of Empire. The letter of transmittal was on an Empire letterhead.

The October 7, 1968 letter from Lucas to Stern Brothers and the letter from Empire to Stern Brothers, dated October 31, 1968 and signed by William L. Elder, Executive Vice-President, referred to the authority of Stern Brothers to act on behalf of Empire.

This evidence was sufficient to make a jury issue on Lucas's agency for Empire. Appellants do not here challenge the admissibility of such evidence. There was adequate evidence from which the jury could have found that Lucas had authority to act for Empire. The weight to be accorded his acts and statements from which

it could be deduced that he did so was for the jury. The notice from Empire executive vice-president terminating Stern Brothers' authority to act in behalf of Empire was evidence that Stern Brothers previously had authority to do so, which authority could have come only through Lucas.

■■ The question here presented is to be determined on the basis of the evidence favorable to Stern Brothers on the issue. State ex rel. Stiers Bros. Const. Co. v. Hughes, 354 Mo. 659, 190 S.W.2d 880, 884 [3, 4] (Banc 1945). The date of Stern Brothers' conclusion that Empire was also involved is not significant insofar as liability of Empire is concerned. Banjo v. Wacker, 251 S.W. 456 (Mo.App.1923).

■ Appellants contend that Enggas's testimony that the settlement made by Stern Brothers was reasonable was mere guess and speculation because there was no evidence of the value of the stock delivered by the original plaintiffs.

This is a factor which at the most would have gone to the weight of Mr. Enggas's testimony, not its admissibility. As an attorney he had formed an opinion, in the circumstances of the case, that settlements for $82,807 and $7,395 of claims for $441,599.83 and $39,464.66 were reasonable. The facts in evidence upon which he based such conclusion were stated in the hypothetical question addressed to him and did not include the value of the stock submitted. There was evidence from numerous sources that the total price of the stock submitted, based upon the August 17 offer, was in the vicinity of from $900,000 to $1,000,000. The jury could consider Mr. Enggas's testimony in the light of such evidence.

■ Appellants also object to Enggas's testimony that the August 17 letter constituted a binding offer. Appellants assert that such testimony related to a matter of law, on which expert testimony is not per-

missible. Appellants did not object to the testimony of Mr. Enggas on either the ground of his lack of qualification as an expert or on the ground that the opinion sought to be elicited from him was not properly the subject of expert testimony. In forming his opinion that the settlements were reasonable, such a witness would necessarily consider the question of whether or not the claim against Stern Brothers, realistically viewed, exposed them to potential liability. That would involve an opinion on the legal issue presented in the claims against Stern Brothers. The contested issue in the case on trial was not whether a binding offer had been made, but was rather whether or not in making such an offer Stern Brothers acted as agent for Lucas and, ultimately, whether Stern Brothers acted reasonably in settling the claims against themselves. Mr. Enggas's testimony did go to the facts which supported the reasonableness of the settlements and the fact that in his testimony he did express a legal conclusion as to Stern Brothers' liability does not cause his testimony to run afoul of the rule relied upon by appellants. That rule is designed to eliminate opinion evidence on matters of law properly to be determined by the judge or the jury under instructions from the judge. 7 Wigmore on Evidence, § 1952, p. 81 (3rd ed. 1940).

The conclusion regarding Enggas's testimony disposes of the contention that there was no evidence to support submission of the reasonableness of the settlement by Stern Brothers. That contention is based upon the further contention, answered above, that Enggas's testimony should have been excluded.

The final contention is that the trial court erred in excluding matters set forth in proposed findings of fact, presented by Stern Brothers to the plaintiffs in the federal court case, which appellants argue amounted to admissions. In the federal case, the court ordered the parties to exchange proposed findings of fact. In the procedure Stern Brothers' attorney made certain admissions, to-wit: That Lucas and Davis intended the proposal in the letter of August 17, 1967 to go only to Sophia Terwilliger and members of her family and that the letter was a proposal to negotiate. These exchanges were to provide ultimately the basis for a pretrial order which would define the legal and factual issues which a trial would be required to resolve. However, the court had not signed the pretrial order into which these matters, including the alleged admissions of Stern Brothers, were to have been incorporated. In such circumstances, the admissions by Stern Brothers' attorney were not judicial admissions, nor were they admissions by pleadings. "Rule 16 [of the Federal Rules of Civil Procedure] clearly indicates that only admissions made at a pretrial conference and incorporated in a pretrial order are binding." Taylor v. Allis-Chalmers Manufacturing Company, 320 F.Supp. 1381, 1384 (E.D.Pa.1969), affirmed, 436 F.2d 416 (3rd Cir. 1970).

Judgment affirmed.

HIGGINS, C., not participating.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.