CITY OF CLEVELAND, Plaintiff,

v.

The CLEVELAND ELECTRIC ILLUMINATING COMPANY, Defendant.

Civ. A. No. C75–560.

United States District Court,
N. D. Ohio, E. D.

Aug. 18, 1980.

Opinion on Tender of Admission
Sept. 13, 1980.

Opinion on Motion to Compel Pretrial
Production Sept. 13, 1980.

Opinion on Motion to Exclude Expert's
Economic Testimony Oct. 14, 1980.

Opinion on Admissibility of Trial Exhibits
Oct. 14, 1980.

Opinion on Motion to Exclude Expert's
Management Evidence Oct. 23, 1980.

Opinion on *Noerr-Pennington* Doctrine
Aug. 17, 1981.

Opinion on Motion to Read Admission
to Jury Sept. 3, 1981.

William B. Norris, Hahn, Loeser, Freedheim, Dean & Wellman, James E. Young, Thomas E. Wagner, Director of Law City of Cleveland, Cleveland, Ohio, for plaintiff.

John Lansdale, James P. Murphy, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

Presently before the Court is what is styled "Plaintiff's Motion for Leave to Offer Evidence Relating to the Proceedings of the Federal Power Commission ["FPC"] and the Nuclear Regulatory Commission

["NRC"] as well as to the Acts of the Parties and the Orders Relating to such Proceedings Concerning the Plaintiff's Attempts (1) to Obtain a Continuation of the Load Transfer Service, (2) to Obtain a Permanent Parallel Interconnection and (3) to Obtain the Wheeling of PASNY Power". The City's motion is premised upon the Court's Order in Limine of August 19, 1979, which provides as follows:

> Accordingly, for the foregoing reasons, during the course of trial, no party shall, in the presence of the jury, allude to, refer to, or attempt to convey, either directly or indirectly, in any manner the findings, conclusions, determinations, or substance of any NRC or FPC administrative determination as such determination reflects upon the defendant's acts alleged herein to be in violation of sections 1 or 2 of the Sherman Act. The court is mindful, however, that occasions may arise during trial when a party deems it necessary to discuss, or to elicit testimony concerning, proceedings before the NRC or the FPC. In those instances, counsel shall request a determination by the court as to its propriety and necessity thereof, which request shall be made outside the hearing of the jury.

Pursuant to the Court's August 19th decree, the City currently seeks permission to adduce evidence of certain administrative proceedings undertaken before the FPC and the NRC. The evidence sought to be presented appears to relate primarily to the City's efforts to secure a permanent parallel interconnection with the defendant's electric system and obtain the wheeling of PASNY—generated power over defendant's transmission facilities. The contemplated evidence is both testimonial and documentary in nature, encompassing, *inter alia*, certain of the parties' submissions to the aforesaid administrative forums as well as certain largely unspecified FPC and NRC mandates. Plaintiff maintains that the filings, orders and administrative proceedings in question constitute "an integral part of the commercial relationship" between the parties which cannot be excised from the evidence without adversely affecting the City's presentation of its case.

In assessing the instant motion, the Court would observe initially that it cannot reasonably be denied that litigants are, as a general proposition, fully entitled to adduce relevant and material evidence in support of their substantive allegations. This entitlement is, however, circumscribed by the provisions of Rule 403, Fed.R.Ev., which expressly authorizes the trial court to exclude relevant evidence wherever "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury". *Id.* The governing authorities counsel that the trial judge, in undertaking the weighing process contemplated by Rule 403, is to be accorded broad discretion, as his accommodation of the competing interests will not be disturbed on appeal in the absence of clear abuse. *United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *United States v. Robinson*, 560 F.2d 507, 513–515 (2d Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *United States v. Hall*, 565 F.2d 1052, 1055 (8th Cir. 1977); *Texas Eastern Transmission v. Marine Office-Appleton & Cox Corp.*, 579 F.2d 561, 567 (10th Cir. 1978); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978); *Longenecker v. General Motors Corp.*, 594 F.2d 1283, 1286 (9th Cir. 1979); *United States v. D'Alora*, 585 F.2d 16, 21 (1st Cir. 1978); *United States v. Juarez*, 561 F.2d 65, 70–71 (7th Cir. 1977).

■ The aforesaid Order in Limine reflects the Court's considered judgment that the probative value of certain of the administrative findings, determinations and conclusions in question is decisively outweighed by their prejudicial attributes. It is, for instance, the Court's firm conviction that the introduction of certain of the FPC and NRC findings and determinations, which, incidentally, are premised upon materially different legal standards than those applicable herein, *see e.g.* Memorandum and Order of August 19, 1979, would necessarily

entail a substantial risk that members of the jury would, irrespective of the evidence adduced in this de novo proceeding, arrive at a verdict by either assigning the administrative determinations controlling weight or, at a minimum, by affording the same entirely unwarranted deference. In addition to this readily apparent "undue tendency to suggest decision on an improper basis", Advisory Committee Note to Rule 403, the presentation herein of what the Court has previously described as "the discordant and inconsistent findings of the FPC and NRC" would appear to occasion the very jury confusion Rule 403 was designed to alleviate. As this tribunal has observed in a related context:

> The resolution of the issues presented to the FPC and the NRC has resulted in a spate of indecisive rulings and conflicting opinions. This Court cannot defer a full and fair presentation of the evidence to the discordant and inconsistent findings of the FPC and the NRC. To invoke the doctrine of collateral estoppel by adopting the conflicting administrative decisions and the antithetical findings of fact of the FPC and the NRC would blanket these proceedings with an impenetrable stygian fog of confusion and doubt. This Court shall not become a party to this administrative chaos.

Memorandum and Order, February 15, 1978, at p. 5.

The Court's Order in Limine then is designed in principal part to enable the jury panel to resolve the factual issues joined in the instant cause in a fair and independent manner, unencumbered by the prejudicial impact inherent in certain of the findings and determinations of the foregoing administrative forums. The aforesaid Order is, however, in no way intended to effectuate a blanket prohibition against adducing evidence of all that has transpired before the two regulatory bodies. Indeed, the decree implicitly recognizes that the administrative proceedings in question may prove to comprise an important part of the commercial relationship between the parties and, accordingly, expressly acknowledges that circumstances may in fact develop at trial warranting the presentation of evidence pertaining to the applicable FPC or NRC proceedings. The instant Order, rather than constituting a broad and categoric proscription against evidence of, and reference to, the aforesaid administrative proceedings, represents instead simply an effort to foreclose attempts to convey to the jury, by way of testimony, exhibit, or argument, the substance of certain administrative determinations which express or otherwise embody the regulatory agency's findings, opinions and conclusions respecting the ultimate issues in dispute in the instant action. That is to say, the Court's August 19th decree merely seeks to shield the jury from those administrative findings and determinations which would mistakenly advise or suggest to the panel that the precise factual matters here in issue have been authoritatively resolved in the earlier regulatory proceedings, and thereby encourage, in effect, the jury to defer to the preceding administrative judgment.

Accordingly, the Order in Limine will not, generally speaking, operate to exclude otherwise admissible evidence of either the City's resort to the regulatory bodies in question or the material factual circumstances underlying the plaintiff's pursuit of such administrative relief. Nor will the decree necessarily foreclose the parties from presenting evidence of the specific relief ultimately ordered by a particular administrative forum. By way of contrast, testimonial or documentary evidence tending to disclose or intimate to the jury that the prescribed administrative relief was predicated, in whole or in substantial part, upon specific agency findings of anticompetitive conduct, for example, would appear to fall within the prohibition of the August 19th mandate and properly excluded thereunder. The jury's verdict in this de novo proceeding must be premised upon the panel's own independent assessment of the evidence adduced, untainted by the undue deference likely to be accorded those administrative determinations which express or otherwise reflect the regulatory body's findings and conclusions regarding the ultimate factual issues here in dispute.

■ Although the Court has, for the benefit of the parties, undertaken to delineate, in a preliminary and somewhat general fashion, the contours of the aforesaid Order in Limine, and elaborate further upon the theoretical underpinnings thereof, the Court is nonetheless constrained to conclude that the implementation of the foregoing decree must, in the final analysis, await the trial of this cause. The Court accordingly defers ruling upon the City's current motion until the appropriate instances at trial, wherein the Court may specifically assess the propriety of any offered evidence, and the soundness of objections thereto, in the context of the evidence theretofore adduced. The Court's August 19th decree shall, in the interim, remain in full force and effect.

The Court would in closing, however, strongly urge the parties to consider the use of stipulations as a means of apprising the jury, within the dictates of the Order in Limine, of the substance of those administrative filings, orders and proceedings which may in fact prove necessary to the full and fair presentation of the case. The Court currently discerns no reason why the litigants cannot enter into essentially neutral stipulations which would relate, for example, that the parties instituted or otherwise participated in specified regulatory proceedings, the pertinent dates of the proceedings, the nature of the relief sought therein, and the actual relief ultimately prescribed. Properly drafted stipulations of such a nature would enable the jury to become sufficiently apprised of the pertinent regulatory proceedings, deleting from the presentation of evidence only those highly prejudicial administrative findings and determinations which parallel or closely approximate the ultimate factual issues to be resolved herein.

In accordance with the foregoing, the Court's ruling upon the instant motion is hereby deferred until the appropriate instance or instances at trial.

IT IS SO ORDERED.

## ON TENDER OF ADMISSION

The defendant the Cleveland Electric Illuminating Company (CEI) has tendered the following admission in this case:

CEI has in the past intended, and attempted, to reduce or eliminate competition between it and Muny Light by one or more of the following means:

1. Acquisition by purchase
2. Agreement with Muny Light express or implied to reduce or eliminate competition by one or a combination of means—such as:
   a. Equalization of rates to private customers.
   b. A mutual policy of refraining from soliciting or expanding to serve the other's customers—a mutual "live and let live" situation.
3. When competition could not be peacefully reduced or eliminated, CEI competed as vigorously as it could in the area in which there is duplication of service with Muny Light and still intends to do so. In furtherance of this effort CEI sometimes sought to avoid doing (and in any event did not wish to do) things which would help Muny Light to compete more effectively.

CEI submits that the tendering of this admission eliminates from this controversy the issue of monopolistic intent and thereby renders inadmissible a substantial quantity of the plaintiff's evidence. CEI accordingly seeks a pretrial determination which would exclude from evidence approximately 1,025 trial exhibits, as well as related oral testimony, pertaining to: (i) events antedating the statutory limitations period; and (ii) conduct protected under what has come to be known as the *Noerr-Pennington* doctrine. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

The parties have briefed the issues presented by the defendant's proposed admission and the Court has, in addition, permitted the litigants extensive oral argu-

ment. *See* Transcript of Proceedings (September 10, 1980) at pp. 345–434. The Court is persuaded by its review of the record and the applicable authorities that the proper inquiry to be undertaken herein is essentially that addressed in 9 Wigmore on Evidence § 2591 (3d ed. 1940):

A fact that is judicially admitted *needs* no evidence from the party benefiting by the admission.

But his evidence, if he chooses to offer it, *may* even be *excluded*; first because it is now as immaterial to the issues as though the pleadings had marked it out of the controversy (*ante,* § 2); next because it may be superfluous and merely cumber the trial (*ante,* §§ 1863, 1904); and furthermore, because the added dramatic force which might sometimes be gained from the examination of a witness to the fact (a force, indeed, which the admission is often designed especially to obviate) is not a thing which the party can be said to be always entitled to.

Nevertheless, a colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate *moral force of his evidence*; furthermore, a judicial admission may be cleverly made with grudging limitations or evasions or insinuations (especially in criminal cases), so as to be technically but not practically a waiver of proof. Hence, there should be no absolute rule on the subject; and the trial Court's discretion should determine whether a particular admission is so plenary as to render the first party's evidence wholly needless under the circumstances. [emphasis in original].

Plaintiff, in challenging the sufficiency of the tendered admission, argues that the carefully drafted language thereof may not suffice to enable the City to sustain its burden of establishing that "specific intent" which must be demonstrated in order to support an attempt to monopolize charge. The City asserts in this regard that an admission of an intent to eliminate competition by essentially neutral and nonpredatory means is, in a Sherman Act Section 2 case, akin to the "colorless admission" alluded to by Dean Wigmore. In addition to its contention that the offered admission does not, in reality, constitute a sufficient admission of monopolistic intent, plaintiff maintains that a significant portion of the pre-limitations period evidence which CEI seeks to exclude must in fact be presented to the jury to enable the panel to properly assess the character of that potentially actionable conduct which transpired within the applicable four-year limitations period. Plaintiff insists that evidence concerning events antedating the limitations period is, irrespective of the tendered admission, necessary to "illuminate and explain the conduct within the damage period". Transcript at p. 410.

In assessing the foregoing contentions, the Court would observe that it is well-established that evidence of events occurring prior to and following the running of the statute of limitations may be admissible in antitrust proceedings to "show the purpose and character of particular transactions under investigation". *Panotex Pipe Line Co. v. Phillips Petroleum Co.,* 457 F.2d 1279, 1285 (5th Cir. 1972). This follows from the "established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny". *Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 705, 68 S.Ct. 793, 805, 92 L.Ed. 1010 (1948), *citing Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Thus, it has been held that "in antitrust cases, if full effect is to be given the antitrust laws, it is necessary to develop fully the background of facts out of which the alleged conspiracy arose and in which it operated". *United States v. E.I. DuPont De Nemours & Company,* 126 F.Supp. 27, 29 (N.D.Ill.1954). *Accord: United States v. General Electric Company,* 82 F.Supp. 753, 903 (D.N.J.1945); *Commonwealth Edison Company v. Allis-Chalmers Manufacturing Co.,* 40 F.R.D. 96, 100 (N.D.Ill.1966). *See also Pitchford v.*

*Pepi, Inc.*, 531 F.2d 92, 106 (3d Cir. 1975), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976) (evidence regarding "historic development" of alleged violations admissible). The admission of such pre-limitations evidence would appear to comport with the recognition that the "general rule favoring admissibility of evidence is particularly important in antitrust cases where liberal reception of evidence may be necessary for the just determination of particularly complex disputes." 16N J. von Kalinowski, Business Organizations: Antitrust Laws and Trade Regulation § 112.05[1] at 112–20 (1980). *Accord: Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., supra; United States v. E. I. DuPont de Nemours & Co.*, 10 F.R.D. 618, 621 (D.Del.1950).

The foregoing evidentiary principles, however, do not confer upon litigants "a virtually unlimited license to rove at will through the past." *Austin Theatre, Inc. v. Warner Bros. Pictures, Inc.*, 30 F.R.D. 156, 157 (S.D.N.Y.1958). That is to say, the trial court is fully entitled, in the exercise of its discretion, to exclude evidence of prior and subsequent transactions where the probative value of the same is clearly outweighed by certain legitimate interests of the Court and the opposing party. As observed by the Third Circuit Court of Appeals in *Belmont Industries, Inc. v. Bethlehem Steel Corp.*, 512 F.2d 434, 438–39 (3d Cir. 1975):

> In an anti-trust suit evidence of events which occur after the filing of the complaint may be probative of the intent of the parties. However, though relevant, evidence of subsequent events may be excluded from trial in order to protect other legitimate interests of the court and the opposing party. As stated in *McCormick*:
>
> > There are several counter-balancing factors which may move the court to exclude relevant evidence if they outweigh the probative value .... First, the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy. Second, the probability that the proof and the answering evidence that it pro-

vokes may create a side issue that will unduly distract the jury from the main issues. Third, the likelihood that the evidence offered in the counterproof will consume an undue amount of time.

The decision whether the risk of unreasonably prolonging the trial or prejudicing or distracting the jury justifies exclusion of proffered evidence is committed to the discretion of the district court. [footnotes omitted].

The above precepts would now appear embodied in Rule 403, Fed.R.Evid., which expressly authorizes the trial court, in the exercise of its broad discretion, *see United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *United States v. Robinson*, 560 F.2d 507, 513–515 (2d Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *United States v. Hall*, 565 F.2d 1052, 1055 (8th Cir. 1977); *Texas Eastern Transmission v. Marine Office-Appleton & Cox Corp.*, 579 F.2d 561, 567 (10th Cir. 1978); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978); *Longenecker v. General Motors Corp.*, 594 F.2d 1283, 1286 (9th Cir. 1979); *United States v. D'Alora*, 585 F.2d 16, 21 (1st Cir. 1978); *United States v. Juarez*, 561 F.2d 65, 70–71 (7th Cir. 1977), to exclude evidence whenever its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." It is of some significance to note, however, as Dean Wigmore appears to recognize, that the mere tendering of an admission does not necessarily deprive evidence relating to the substance of the admission of its probative value. *See generally* Advisory Committee Note to Rule 401, Fed.R.Evid. As recently observed by the Fifth Circuit Court of Appeals in *United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir. 1979), *cert. pending*:

> It could also be argued that the offer of a stipulation, as a matter of law, totally eviscerates the probative value of a piece of evidence relevant to the matter stipu-

lated and thus mandates exclusion of that evidence under Rule 403. The effect of adopting this opposite extreme in construing the Rule would be to require a party to accept any stipulation offered by his opponent and thus would allow a party to control the proof presented by his opponent at trial. We also reject this construction of Rule 403. A piece of evidence can have probative value even in the event of an offer to stipulate to the issue on which the evidence is offered. A cold stipulation can deprive a party "of the legitimate moral force of his evidence," 9 Wigmore on Evidence § 2591 at 589 (3rd ed. 1940), and can never fully substitute for tangible, physical evidence or the testimony of witnesses. In most cases, a party has the right "to present to the jury a picture of the events relied upon." *Parr, supra*, 255 F.2d at 88.

An offer to stipulate nevertheless remains a salient factor in the weighing process contemplated under Rule 403, as the applicable authorities counsel that the trial court may properly consider the tendered admission "as one element in the balancing required in exercising its discretion". 22 Wright & Graham, Federal Practice and Procedure § 5194 at pp. 198–199 (1978). As observed in *United States v. Provenzano*, 620 F.2d 985, 1003–1004 (3d Cir. 1980):

> An offer to stipulate does not automatically mean that the fact may not be proved instead, as long as the probative value of the proof still exceeds the prejudicial effect, taking into account the offer to stipulate.

*Accord: United States v. Grassi, supra*, 602 F.2d at 1197; *United States v. Peltier*, 585 F.2d 314, 324 (10th Cir. 1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). *See* Advisory Committee Note to Rule 403 ("[i]n reaching a decision whether to exclude on grounds of unfair prejudice . . . [t]he availability of other means of proof may also be an appropriate factor").

■ In view of the foregoing principles, the Court is of the opinion that it would be improvident at this comparatively early stage of the trial proceeding to order the broad exclusion of evidence which the defendant currently seeks. Applying the criteria enumerated by Dean Wigmore, this tribunal cannot, at this early juncture, conclude that the admission here in question is in fact so plenary in nature and scope as to render the City's proposed evidence "wholly needless under the circumstances." *Wigmore on Evidence, supra.* While the Court acknowledges that the evidence, as it unfolds, may ultimately warrant in view of the tendered admission the exclusion, in whole or in part, of the trial exhibits and oral testimony in question, the Court is currently persuaded that the weighing process embodied in Rule 403, and the similar balancing analysis which governs the admissibility of evidence relating to activities protected by the *Noerr-Pennington* doctrine, *see United Mine Workers of America v. Pennington, supra*, 381 U.S. at 670 n.3, 85 S.Ct. at 1593; *Feminist Womens Health Center v. Mohammad*, 586 F.2d 530, 543 n.7 (5th Cir. 1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), are more appropriately undertaken in the context of the evidence theretofore adduced. To exclude broad categories of evidence in this action, prior to the presentation of any proof, might appear in a controversy of this nature to risk depriving the plaintiff of what may ultimately be demonstrated to be the "legitimate moral force" of its evidence. The Court is thus constrained to conclude that the extent to which the litigants may properly adduce evidence which pertains to the substance of the tendered admission is a matter which must await the actual presentation of proof in this case.

For the reasons hereinbefore stated, the Court hereby defers ruling upon the propriety of excluding the evidence in question until the appropriate instances at trial. Should it become apparent at any time in this proceeding that the probative value of the offered evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence", Rule 403, the Court

will not hesitate to exclude the objectionable proof.

IT IS SO ORDERED.

## ON MOTION TO COMPEL PRETRIAL PRODUCTION

■ Presently before the Court is the motion of defendant, The Cleveland Electric Illuminating Company (CEI), to compel pretrial production of data and calculations underlying the conclusions contained in the reports of certain experts which plaintiff, the City of Cleveland, intends to call as witnesses herein. Plaintiff, by memorandum filed August 28, 1980, has responded in opposition. As indicated by the Court in pretrial proceedings conducted on September 6, 1980, and for the reasons developed more fully below, the Court is of the opinion that the instant request is properly granted.

By ruling issued May 3, 1979, this tribunal ordered the parties to exchange the names of and the written reports and conclusions compiled by all expert witnesses expected to testify at the trial of this case. *City of Cleveland, v. The Cleveland Electric Illuminating Company,* Case No. C75–560 (N.D.Ohio May 3, 1979). In so ruling, the Court embraced "the fundamental policy of preventing unfair surprise at trial," *Id.* slip op. at 1, and further elaborated:

Disclosure of such information also will serve the end of effective and efficient examination of these experts at trial, thereby resulting in a narrowing of intricate and complex issues.

*Id.*

Included among the materials submitted by plaintiff pursuant to the aforesaid Order were written reports compiled by Dr. Harold H. Wein (Wein) and William R. Mayben (Mayben) of R. W. Beck & Associates which reflect the results of elaborate calculations presumably premised upon various computer simulations. Defendant, however, contends that "the program used and the various inputs and assumptions cannot be confidently deduced from the data presented," and that "it is therefore impossible adequately to prepare for the cross examination of these witnesses or to tell whether cross examination is warranted..." *See* Memorandum in Support of Defendant's Motion, p. 1. To facilitate its trial preparation, defendant presently seeks disclosure of the data and programs employed by Wein and Mayben in formulating the results and conclusions set forth in their respective reports.

Only recently have courts and commentators begun assessing the unique problems presented where a litigant seeks to utilize computerized information in the presentation of his case. In this regard, the First Circuit Court of Appeals has observed that "any use of computerized data presents some obstacles to effective cross-examination ... because of the difficulty of knowing the precise methods employed in programming the computer as well as the inability to determine the effectiveness of the persons responsible for feeding data into the computer." *United States v. Cepeda Penes,* 577 F.2d 754, 760–61 (1st Cir. 1978). Consequently, those authorities which have addressed the issue have consistently recognized the discoverability of underlying data as well as plans and programming methods from which a particular system or computer study emerged.

Professors Wright & Miller, in their commentaries on the Federal Rules of Civil Procedure, have quite appropriately hypothesized:

For example, suppose one party plans to present a computer study of his opponent's pricing structure or a computer simulation of the market in an antitrust case. In order to prepare to defend against the conclusions that are said to flow from these efforts, the discovering party not only must be given access to the data that represents the computer's "work product", but he also must see the data put into the computer, the programs used to manipulate the data and produce the conclusions, and the theory or logic employed by those who planned and executed the experiment.

8 Wright & Miller, *Federal Practice and Procedure*, § 2218. In *United States v. Russo*, 480 F.2d 1228 (6th Cir. 1973), the Sixth Circuit Court of Appeals voiced similar concerns in concluding that the facilitation of orderly and efficient pretrial preparation requires that a litigant who intends to introduce computerized data or expert opinions predicated thereon furnish his adversary with program methods utilized as well as underlying data, inputs and outputs well in advance of trial:

> Appellant also complains that he was not given an opportunity to prepare his defense to the computerized material used by the prosecution. In *United States v. Stifel*, 433 F.2d 431 (6th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971), this Court held that if the Government uses highly sophisticated scientific evidence (in that case, neutron activation analysis) involving time consuming and expensive laboratory tests, it must allow time for a defendant to make similar tests. The Manual for Complex and Multidistrict Litigation deals at some length with the use of computer evidence. Its admissibility is strongly defended where the records have been kept in the regular course of business and its reliability has been demonstrated. The Manual further states,

> > It is essential that the underlying data used in the analyses, programs and programing method and all relevant computer inputs and outputs be made available to the opposing party far in advance of trial. This procedure is required in the interest of fairness and should facilitate the introduction of admissible computer evidence. Such procedure provides the adverse party and the court with an opportunity to test and examine the inputs, the program and all outputs prior to trial.

*See also United States v. Dioguardi*, 428 F.2d 1033, 1038 (2nd Cir. 1970), *cert. denied*, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970).

And, finally, in *United States v. Liebert*, 519 F.2d 542 (3rd Cir. 1975) *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 301 (1975), the Third Circuit Court of Appeals explained that "a party seeking to impeach the reliability of computer evidence should have sufficient opportunity to ascertain by pretrial discovery whether both the machine and those who supply it with data input and information have performed their tasks accurately." *Id.* at 547. *See also* 1 *Moore's Federal Practice*, Pt. 2, § 2.71, pp. 131–132 (1979) ("underlying data used to compose the statistical computer input, the methods used to select, categorize and evaluate the data for analysis, and all of the computer outputs normally are proper subjects for discovery."); *Perma Research & Development v. The Singer Company*, 542 F.2d 111, 115 (2nd Cir. 1976), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1977) ("better practice for opposing counsel to arrange for the delivery of all details of the underlying data and theorems employed in these simulations in advance of trial... to avoid unnecessarily belabored discussion of highly technical, tangential issues at trial...").

Compelling pretrial production of the information sought herein is not only entirely consistent with the foregoing precedents, but indeed is necessary to the successful implementation of this tribunal's aforementioned May 3, 1979 decree. Certainly, where, as here, the expert reports are predicated upon complex data, calculations and computer simulations which are neither discernible nor deducible from the written reports themselves, disclosure thereof is essential to the facilitation of "effective and efficient examination of these experts at trial..." *City of Cleveland v. The Cleveland Electric Illuminating Company, supra.*

Accordingly, defendant's Motion to Compel pretrial production of data and calculations underlying the Wein and Mayben reports is hereby granted. As the Court indicated in the aforementioned pretrial proceedings, the principles enumerated herein

shall apply with equal force to the disclosure of data and calculations underlying any and all of the defendant's expert reports.

IT IS SO ORDERED.

## ON MOTION TO EXCLUDE EXPERT'S ECONOMIC TESTIMONY

■ Presently before the Court is the plaintiff City of Cleveland's Motion in Limine of June 10, 1980, whereby the City seeks an order barring the introduction of certain of the anticipated trial testimony of defendant's expert witness, Abraham Gerber. The expected testimony which the plaintiff finds objectionable is briefly summarized in Gerber's report, which provides in relevant part that Gerber:

[W]ill describe the inherent economic characteristics of the electric utility industry which have led to its growth and development as a natural monopoly and *have resulted in the public policy determination that the industry be subject to government regulation rather than left free to react to unrestrained competitive market forces.* [emphasis supplied.]

The City construes the above-emphasized language as denoting that Gerber will "assert that because of certain government regulation, the electric utility industry is not subject to the [federal] antitrust laws". Memorandum in Support of Plaintiff's Motion in Limine, at pp. 1–2. The plaintiff accordingly urges that Gerber's anticipated testimony is, at least in pertinent part, incorrect as a matter of law due to the pronouncements of *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) and its progeny, which establish beyond "doubt . . . that the federal antitrust laws are applicable to electrical utilities." *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596 n.35, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976).

The Court is of the opinion that the plaintiff's contention proceeds from a false premise. Simply stated, the Court does not share the City's belief that Gerber will be asked to opine that defendant CEI, as a regulated public utility, is immune from antitrust liability. The Court would observe in this regard that the plaintiff's belief is neither supported by a fair reading of the above-quoted summary of Gerber's anticipated testimony or by the defendant's representations to date, which expressly disavow any intention of adducing evidence for the purpose of claiming exemption from the federal antitrust laws. *See* Defendant's Memorandum in Opposition, at p. 1.

The Court would discern from the instant record that the expected testimony of Gerber is not, as the City conjectures, intended to provide evidentiary support for a yet-to-be advanced defense of antitrust immunity. It would appear instead that the testimony in issue is designed to demonstrate that certain inherent economic characteristics of the electric utility industry have resulted in the industry's growth and development as a natural monopoly, and that these inherent economic attributes have given rise to a general recognition that it is in the public interest to subject the electric utility industry to the dictates of government regulation in lieu of the operation of unrestrained competitive market forces. The Court is persuaded that testimony which tends to establish the validity of the foregoing propositions, if properly elicited, may well prove material to one or more of the issues presently joined in this controversy. Underlying the Court's conclusion, of course, is the recognition that the "antitrust laws are not so inflexible as to deny consideration of governmental regulation." *Mid-Texas Communications Systems, Inc. v. American Telephone and Telegraph Co.*, 615 F.2d 1372, 1385 (5th Cir. 1980). That is to say, "antitrust courts can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation. Just as the administrative agency must consider the competitive premises of the antitrust laws, the antitrust court must consider the peculiarities of an industry as

recognized in a regulatory statute." 1 P. Areeda & D. Turner, Antitrust Law § 223d (1978). As observed by the Ninth Circuit Court of Appeals in *International Telephone* and *Telegraph Corp. v. General Telephone and Electronics Corp.*, 518 F.2d 913, 935–936 (9th Cir. 1975):

> This is not to say that the nature and extent of regulation is, in the absence of an exemption, irrelevant from a factual perspective. The impact of regulation on pricing and other competitive factors is too obvious to be ignored. In the absence of an exemption claim, the fact of regulation is significant, but not because it embodies a doctrinal scheme different from the antitrust law; the sole legal perspective is afforded by the antitrust law. Rather, the impact of regulation must be assessed simply as another fact of market life. [footnote omitted]

*See Almeda Mall, Inc. v. Houston Lighting and Power Co.*, 615 F.2d 343, 354 (5th Cir. 1980).

It appearing to the Court that the defendant will not, through the testimony of Gerber or otherwise, attempt to assert or otherwise intimate that CEI is in fact immune from antitrust liability as a consequence of governmental regulation, and it appearing further that evidence concerning the nature and impact of such regulation may prove germane to the jury's consideration of, *inter alia*, the existence of monopoly power, and the propriety of the defendant's conduct generally, the conclusion is compelled that there is currently no basis for barring at this preliminary juncture the introduction of the testimony here in dispute. The Court will, however, as it has throughout the instant proceedings, entertain any and all timely objections interposed during the course of trial.

For the reasons hereinbefore stated, the plaintiff's motion for an order in limine to bar the introduction of certain of the anticipated testimony of the aforementioned expert witness is currently without merit and properly denied.

IT IS SO ORDERED.

## ON ADMISSIBILITY OF TRIAL EXHIBITS

■ This matter is presently before the Court for a determination concerning the admissibility of certain of the plaintiff's trial exhibits, denominated by the parties as "Muny Light Electric Meter Bureau Reports". *See* PTX 1816 through 1829. These reports include, in contested part, monthly listings of former Muny Light customers who have elected to decline further electric power service from the Muny Light system, together with the particular reason or reasons assigned for each customer's decision to forego further MELP service. The manner in which the data contained in the meter reports was compiled is summarized by the plaintiff thusly:

> Whenever MELP was informed that one of its customers was switching to CEI, one of its employees would prepare a "remove meter card" with the customer's address and a notation that the customer had switched to CEI. (PTX 2423, 2424). Members of the "outside crew" would then take the cards, go to the addresses indicated, remove the meters and ask the customers why they had switched. The crew members would record the responses on the cards, then return them to MELP. The Meter Bureau Reports were prepared from the cards.

Plaintiff seeks to introduce the exhibits in question for the purpose of demonstrating the purported reason that the particular customers listed therein switched their patronage from Muny Light to defendant CEI. The City maintains that the reports are properly admitted for this purpose pursuant to Rule 803(6), Fed.R.Ev., or, in the alternative, Rule 803(8), Fed.R.Ev. The former provision states as follows:

> The following are not excluded by the hearsay rule...
>
> (6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from

information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

In opposing the introduction of the various meter reports, CEI argues that the "records of regularly conducted activity" exception to the hearsay rule is without application in instances where, as here, the individual who initially supplies the information does not, in so doing, act in the regular course of business. The Court's review of the applicable authorities discloses that there exists ample support for the defendant's contention. The Advisory Committee's Note to Rule 803(6), for example, provides in relevant part:

> Sources of information presented no substantial problem with ordinary business records. All participants, including the observer or participant furnishing the information to be recorded, were acting routinely, under a duty of accuracy, with employer reliance on the result, or in short "in the regular course of business." *If, however the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail.* An illustration is the police report incorporating information obtained from a bystander: the officer qualifies as acting in the regular course but the informant does not. The leading case, *Johnson v. Lutz*, 253 N.Y. 124, 170 N.E.

517 (1930), held that a report thus prepared was inadmissible. Most of the authorities have agreed with the decision. [citations omitted]. The point is not dealt with specifically in the Commonwealth Fund Act, the Uniform Act, or Uniform Rule 63(13). However, Model Code Rule 514 contains the requirement "that it was the regular course of that business for one with personal knowledge ... to make such a memorandum or record or to transmit information thereof to be included in such a memorandum or record..." *The rule follows this lead in requiring an informant with knowledge acting in the course of the regularly conducted activity.* [emphasis supplied].

Weinstein's Commentary on the Federal Rules of Evidence similarly provides:

> Each participant in the chain producing the record—from the initial observer-reporter to the final entrant—must be acting in the course of this regularly conducted business, or must meet the test of some other hearsay exception. The reason underlying the business records exception fails if any of the participants is outside the pattern of regularity of activity.
>
> > The mere fact that recordation of third party statements is routine, taken apart from the source of the information recorded, imports no guaranty of the truth of the statements themselves. There is no reason for supposing an intention to make admissible hearsay of this sort. So to construe these statements would make of them almost limitless dragnets for the introduction of random, irresponsible testimony beyond the reach of the usual tests for accuracy.
>
> The essential link is sometimes broken because the supplier of the data is not acting within the course of a regular business. A recurring situation is that of a "volunteer" offering information to persons conducting an inquiry or investigation. The person to whom the infor-

mation is offered cannot qualify as the initial person in the chain because he does not have personal knowledge of the underlying event.

4 Weinstein's Evidence ¶ 803(6)[04] at pp. 803–156–157 (footnotes omitted). Prevailing legal precedent in this Circuit is substantially in accord. *See United States v. Graham*, 391 F.2d 439, 447–448 (6th Cir.), cert. denied, 393 U.S. 941, 89 S.Ct. 307, 21 L.Ed.2d 278 (1968); *United States v. Yates*, 553 F.2d 518, 521 (6th Cir. 1977).

It is apparent from the foregoing authorities that the plaintiff's reliance upon the provisions of Rule 803(6) is entirely misplaced. Under the circumstances prevailing herein, it cannot be concluded that the instant informants', in disclosing the reasons underlying their election to terminate MELP service, acted "in the course of a regularly conducted business activity" within the meaning of Rule 803(6). The absence herein of any discernible "duty of accuracy" on the part of the suppliers of the data, *i.e.*, the former customers of Muny Light, renders the ensuing compilations of such data inherently unreliable and therefore properly excluded.[1]

Plaintiff alternatively seeks the introduction of the exhibits in issue pursuant to the provisions of Rule 803(8), which except from the operation of the hearsay rule:

Records, reports, statements or data compilations, in any form, of public offices or agencies setting forth ... in civil actions ..., factual findings resulting from an investigation made pursuant to an authority granted by law, *unless the sources of information or other circumstances indicate lack of trustworthiness.* [emphasis supplied].

In passing on the applicability of Rule 803(8), the Court observes initially that, in view of the above-emphasized language, it would certainly be incongruous to hold that while a given compilation lacks sufficient trustworthiness for admission as a business record under Rule 803(6), it is nonetheless properly introduced into evidence as a public report pursuant to Rule 803(8).[2] The Court notes further that the Sixth Circuit Court of Appeals has intimated that Rule 803(8) is not to be utilized as a means of introducing into evidence underlying data which lacks any significant indicia of reliability. Thus, in the case of *Baker v. Elcona*

---

1. The Court finds unpersuasive the plaintiff's assertion that sufficient trustworthiness is imparted herein by the mere fact that the former Muny Light customers have previously "stood in a business relationship" with the MELP enterprise. The Court observes in this regard that the City is apparently unable to advance any legal authority which lends support to this rather expansive construction of Rule 803(6). The Court would observe additionally that the "business relationship" which the plaintiff suggests assures reliability is one which, under the instant circumstances, has apparently deteriorated to such a degree that the informant-customer has deemed it in his best interest to sever the relationship and secure electric power service from an alternate source. While one could at least argue that informants who supply information in the course of an existing and continuing business relationship with the party offering the ensuing business records act under some discernible "duty of accuracy", it is difficult to perceive any logical or legal basis for assigning special trustworthiness to statements elicited not in the course of an enduring business relationship but rather at a time where, as here, the relationship was in the very process of being terminated.

2. The Court does not mean to imply that it necessarily concurs with the City's assertion that the meter reports in issue contain in material part "factual findings resulting from an investigation" as that term is employed in Rule 803(8). The Court observes in this respect that there is no evidence of "investigative" activity on the part of the MELP employees beyond the mere soliciting and recording of the customers responses, the substance of which were apparently taken entirely at face value and subjected to no further scrutiny or effects directed toward verification. To say that this rather cursory procedure constituted an "investigation" for purposes of Rule 803(8) would appear to confer upon the provision an extremely broad scope. Moreover, it is clear from the procedures followed that the accuracy of the meter reports, insofar as they purport to set forth the particular reasons underlying customer loss, depend entirely upon the veracity of the customer-informants who, as indicated, proffered their respective explanations in the absence of any compulsion of accuracy.

*Homes Corp.,* 588 F.2d 551 (6th Cir. 1978), the Court of Appeals, while finding that an accident report prepared in the aftermath of a thorough investigation by an experienced State Highway Patrolman was properly admitted under Rule 803(8), expressly declined to extend the coverage of said provision to encompass a statement secured from the defendant-driver which had been appended to the accident report, stating:

> The appellants also challenge the admissibility of the report insofar as it contained the statement of the driver Slabach. This would not, in our judgment, be admissible under Rule 803(8).

*Baker, supra* at 559.[3]

The Court, for all the reasons outlined above, is constrained to conclude that the exhibits here in issue, insofar as they purport to contain the recorded responses of the former Muny Light customers, do not fall within the ambit of the hearsay exceptions embodied in the provisions of Rules 803(6) and 803(8). The defendant's objection to PTX 1816 through 1829, as well as to PTX 2423 and 2424, is well-taken and hereby sustained.

IT IS SO ORDERED.

## ON MOTION TO EXCLUDE EXPERT'S MANAGEMENT EVIDENCE

■ Presently before the Court is what is styled plaintiff's "Motion in Limine to Bar Testimony of One of Defendant's Expert Witnesses, Dennis Merbach and Evidence Relating to the Management of Non-MELP Operations". Defendant, by memorandum of June 12, 1980, has responded in opposition.

A review of the record discloses that in connection with its assertion that the injuries claimed in this action are attributable to the mismanagement of MELP rather than the defendant's alleged misconduct, CEI has engaged the services of Arthur Young & Company, of which Merback is a director, for the purpose of evaluating the management and performance of certain of the City's proprietary concerns. The specific municipal enterprises which Merback has apparently studied and analyzed include the Divisions of Water & Heat, Water Pollution Control, Auditorium and Stadium, Municipal Parking Lots, Airports, and Cemeteries.

The defendant seeks to introduce, by way of testimony and documentary evidence, the findings and conclusions of its consultants, which assertedly demonstrate that the plaintiff's non-MELP proprietary concerns share in common with Muny Light various management deficiencies, which include, *inter alia*, the lack of long-term planning, inadequate capital investment, insufficient maintenance, an improvident rate structure, and a "management style which aptly could be characterized as management-by-crisis." Defendant's Memorandum in Opposition, at p. 1. CEI maintains that evidence of this nature provides corroboration for its aforementioned assertion that mismanagement, and not the defendant's alleged misconduct, is ultimately responsible for any damage sustained by Muny Light, in that it demonstrates that similarly administered non-MELP proprietary concerns suffered financial difficulties akin to those encountered by Muny Light notwithstanding the fact that these former enterprises were not subject to the anticompetitive conduct alleged in the City's Second Amended Complaint. CEI thus submits that the evidence in issue is properly introduced for the purpose of illustrating that "where the purported cause [*i.e.* defendant's antitrust violations] was wholly absent, the same problems occurred in similar City-run proprietary activities". Defendant's Memorandum in Opposition at p.3.

---

**3.** The Sixth Circuit proceeded to hold that while the driver's statement was not within the scope of Rule 803(8), it was nevertheless properly introduced pursuant to a separate exception to hearsay rule codified in Rule 801(d)(1)(B). In the instant action, it would not appear that the customers' responses "meet the test of some other hearsay exception", Weinstein's Evidence, *supra,* and the City does not contend otherwise.

In opposing the introduction of evidence relating to the operation of the City's non-MELP enterprises, plaintiff initially questions the relevancy thereof, *see* Rule 402, Fed.R.Ev., and argues, alternatively, that even in the event the proof falls within the ambit of Rule 401's definition of "relevant evidence", its probative value is nonetheless "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury". Rule 403. In assessing this latter contention, the Court would observe that in undertaking the weighing process contemplated under Rule 403, the trial judge is accorded broad discretion, and his accommodation of the competing interests will not be disturbed on appeal in the absence of clear abuse. *Texas Eastern Transmission v. Marine Office-Appleton & Cox Corp.*, 579 F.2d 561, 567 (10th Cir. 1978); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978); *United States v. Hall*, 565 F.2d 1052, 1055 (8th Cir. 1977); *United States v. D'Alora*, 585 F.2d 16, 21 (1st Cir. 1978); *United States v. Juarez*, 561 F.2d 65, 70–71 (7th Cir. 1977). This broad discretion is appropriately conferred in recognition of the trial court's "superior position to evaluate the impact of the evidence", *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir. 1977), which, *inter alia*, enables the trial judge to "better . . . sense the dynamics of the trial." *Longenecker v. General Motors Corp.*, 594 F.2d 1283, 1286 (9th Cir. 1979). As succinctly stated by the Seventh Circuit Court of Appeals in *United States v. Juarez, supra*:

> This weighing process is primarily for the district judge to perform; trial judges are much closer to the pulse of a trial than we ever can be, and "broad discretion" is necessarily accorded them in balancing probative value against prejudice.

The Court, in the exercise of its discretion, is persuaded that it would be contrary to the express mandate of Rule 403 to permit the defendant to adduce evidence of the management and performance of each of the diverse proprietary concerns identified above. With the possible exceptions delineated below, the Court is in substantial agreement with the plaintiff's contention that one cannot accurately and reliably deduce the cause or causes of MELP's financial plight from the success or failure of the plaintiff's non-MELP enterprises. The proprietary activities administered by the Divisions of Auditorium and Stadium, Municipal Parking Lots, Airports, and Cemeteries, for instance, entail the provision of radically different services than those offered by Muny Light and are accordingly subject to a myriad of divergent economic forces which may or may not similarly impact upon the operation of MELP. Moreover, the aforesaid proprietary concerns would appear to have entirely different administrators, staffs, constituencies and, quite possibly, philosophies, goals and objectives than those attendant to the operation of MELP. In view of the presence of these and other obvious dissimilarities between MELP and the foregoing City enterprises, the Court finds that evidence of the latter's management and performance lacks appreciable probative value and is properly excluded pursuant to Rule 403. To hold otherwise would appear to occasion the very "unfair prejudice, confusion of the issues" and "misleading [of] the jury" which Rule 403 was designed to alleviate.

The Court is not entirely convinced, however, at least at this juncture of the proceeding, that this same result should necessarily obtain with respect to the contemplated evidence which pertains only to the City's Divisions of Water & Heat and Water Pollution Control. These particular enterprises arguably stand on a different footing than the remaining non-MELP proprietary concerns in that the former appear to more. closely approximate Muny Light itself. The evidence has disclosed, for example, that the Divisions of Water & Heat, Water Pollution Control and MELP comprise the three operating divisions of the City's Department of Utilities, all of which are answerable to the direction and supervi-

sion of the City of Cleveland's Director of Public Utilities. *See* PTX 2492. The plaintiff's organizational scheme presumably reflects the fact that these operating divisions are engaged in substantially similar enterprises, all of which entail the supplying of services conventionally associated with public utilities (*i.e.* distribution of water, steam, electricity, etc.).

In view of the apparent similarities between the instant divisions and Muny Light, including the common directional and operational control exerted by the City's Department of Utilities, the Court is of the opinion that it would be improvident at this juncture of the proceedings to categorically exclude any and all evidence concerning the operations of the City's Divisions of Water & Heat and Water Pollution Control. The Court will accordingly defer ruling on this particular aspect of the plaintiff's motion until the appropriate instance at trial, when the contemplated proof can be properly assessed in the context of the evidence theretofore adduced. The Court would advise, however, that having reviewed the applicable case authorities, it is persuaded that before evidence of the mismanagement and poor performance of the non-MELP operating divisions may be properly adduced, it will be incumbent upon the defendant to make a preliminary showing that the circumstances underlying the financial plight of the other operating divisions were virtually identical to those which precipitated the financial difficulties of Muny Light.

For the reasons hereinbefore stated, the motion of the plaintiff for an order in limine is granted insofar as it pertains to the proprietary enterprises administered by the City's Divisions of Auditorium and Stadium, Municipal Parking Lots, Airports, and Cemeteries, and denied as premature insofar as it relates to the Divisions of Water & Heat and Water Pollution Control.

IT IS SO ORDERED.

## ON NOERR–PENNINGTON DOCTRINE

By motion filed February 25, 1976, defendant, The Cleveland Electric Illuminating Company (CEI) sought a pretrial evidentiary ruling from this Court on the admissibility of certain documentary evidence intended to be introduced by plaintiff at trial and bearing upon CEI's attempts to influence members of the Cleveland City Council, public officials, government agencies, general public opinion, and members of the news media with respect to the operation of Cleveland's Municipal Electric Light Plant (MELP), the rates charged for power generated by MELP, and the ultimate disposition of MELP. In support of its request, defendant invoked the *Noerr-Pennington* doctrine which exempts from sanction under the Sherman Act, activities directed toward influencing the passage or enforcement of legislation.

By Order issued September 13, 1978, this tribunal overruled the Motion as premature concluding "that a ruling upon the admissibility of the subject evidence . . . would, at this time, be entered prematurely and without proper consideration of all of the relevant facts and circumstances which necessarily impact any evidentiary ruling made during the course of trial." *City of Cleveland v. CEI*, Case No. C75–560 (N.D.Ohio September 13, 1978), slip op. at 5. The Court further posited:

> Therefore, the appropriate time to raise any objection to the subject documentary evidence is the point at which it is first introduced at trial. At that time, the Court shall entertain the objections of any defendant and rule thereon with greater appreciation of the relevancy and materiality of such evidence, given the facts and circumstances surrounding its development.

*Id.*

### A. THE NOERR–PENNINGTON DOCTRINE

The doctrine itself was examined in this tribunal's Order of September 13, 1978 wherein the Court stated:

"In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S.

127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court of the United States announced what later became known as the *Noerr-Pennington* doctrine. Through Justice Black, the Court therein stated at 135–136, 81 S.Ct. at 528:

We accept, as the starting point for our consideration of the case, the same basic construction of the Sherman Act adopted by the courts below—that no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws. It has been recognized, at least since the landmark decision of this Court in *Standard Oil Co. of New Jersey v. United States*, that the Sherman Act forbids only those trade restraints and monopolizations that are created, or attempted, by the acts of "individuals or combinations of individuals or corporations." Accordingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government as long as the law itself does not violate some provision of the Constitution. (footnotes omitted).

Enlarging upon this theme, the Court went on to exclude from the purview of the Sherman Act, combinations and conspiracies to attempt to influence the passage of legislation through persuasion of the legislative and executive branches of government. Justice Black continued at 136, 137, 81 S.Ct. at 528–529:

We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly. Although such associations could perhaps, through a process of expansive construction, be brought within the general proscription of "combination[s] * * * in restraint of trade," they bear very little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements. This essential dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the Act, even if not itself conclusive on the question of the applicability of the Act, does constitute a warning against treating the defendants' conduct as though it amounted to a common-law trade restraint. And we do think that a question is conclusively settled, against the application of the Act, when this factor of essential dissimilarity is considered along with the other difficulties that would be presented by a holding that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws. (footnote omitted)

The Supreme Court premised its holding upon two precepts of law which touch the very foundations of freedom and democracy in our constitutional form of government. First, the Court propounded,

[i]n a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot

freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act. *Id.* at 137, 81 S.Ct. at 529, (footnote omitted).

Describing the second premise as one "of at least equal significance," *id.*, the Court went on to recognize that

[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms. Indeed, such an imputation would be particularly unjustified in this case in view of all the countervailing considerations enumerated above. *Id.* at 138, 81 S.Ct. at 530.

In summary, the Court concluded:

[I]nsofar as that Act [the Sherman Act] sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity. *Id.* at 140, 81 S.Ct. at 531.

In a later case, *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court reaffirmed its pronouncement in *Noerr Motor Freight* and held that Sherman Act liability could not be premised upon attempts to influence the Secretary of Labor and Tennessee Valley Authority officials to modify their official policies. The Court, interpreting *Noerr Motor Freight* stated:

In *Eastern R. R. Presidents Conf. v. Noerr Motor Freight Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, the Court rejected an attempt to base a Sherman Act conspiracy on evidence consisting entirely of activities of competitors seeking to influence public officials. The Sherman Act, it was held, was not intended to bar concerted action of this kind even though the resulting official action damaged other competitors at whom the cam-

paign was aimed. Furthermore, the legality of the conduct "was not at all affected by any anticompetitive purpose it may have had," id., at 140, 81 S.Ct. at 531—even though the "sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors for the long-distance freight business," id., at 138, 81 S.Ct. at 530. Nothing could be clearer from the Court's opinion than that anticompetitive purpose did not illegalize the conduct there involved.

The Court further explained that the *Noerr-Pennington* doctrine

shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose.

*Id.* 85 S.Ct. at 1593.

Thus, the *Noerr-Pennington* doctrine, as enunciated in the two cases from which its name is derived exempts from sanction under the Sherman Act, activities directed toward influencing the *passage* or *enforcement* of legislation, i.e. petitioning or otherwise lobbying the *legislative branch* of government for the passage of laws or pressuring the *executive branch* for their enforcement. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). In *California Motor Transport, supra*, the United States Supreme Court again reaffirmed the *Noerr-Pennington* doctrine and extended its coverage to overtures made by private citizens or groups and directed at "administrative agencies (which are both creatures of the legislature and arms of the executive) and ... courts, the third branch of government." *Id.* 92 S.Ct. at 611–612. The Court went on to say:

Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition.

We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust

laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors.

*See also Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 543 (5th Cir. 1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). The Court, however, went on to announce the "sham" exception to the *Noerr-Pennington* doctrine holding that where there emerges "a pattern of baseless repetitive claims . . . which leads the factfinder to conclude that the administrative and judicial processes have been abused" by an individual or group with the intent to "harass and deter their competitors from having 'free and unlimited access' to the agencies and courts," a violation of the antitrust laws has been established. *Id.* 92 S.Ct. at 613–614.

## UNDERLYING THEORY

As alluded to hereinabove, the *Noerr-Pennington* doctrine rests primarily upon two firmly established precepts of law.

Apparent from the Supreme Court's pronouncement in *Noerr Motor Freight* is the fact that the doctrine has First Amendment underpinnings; immunizing from antitrust liability the right of the people to engage in political activity and petition their government.

Secondly, the *Noerr-Pennington* doctrine is related to the equally well-established "state action" doctrine enunciated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Indeed, in *Noerr Motor Freight, supra*, the Court stated:

It has been recognized, at least since the landmark decision of this Court in *Standard Oil Co. of New Jersey v. United States*, that the Sherman Act forbids only those trade restraints and monopolizations that are created, or attempted, by the acts of "individuals or combinations of individuals or corporations." Accord-

ingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government as long as the law itself does not violate some provision of the Constitution. (footnotes omitted).

## EVIDENTIARY RAMIFICATIONS

Although the *Noerr-Pennington* doctrine is not, strictly speaking, a rule of evidence, it does carry some evidentiary ramifications. In *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the United States Supreme Court undertook to consider, however briefly, the evidentiary impact of its holdings in *Noerr* and *Pennington*. In an oft-cited footnote, the Court, through Justice White, stated:

It would of course still be within the province of the trial judge to admit this evidence, if he deemed it provocative and not unduly prejudicial, under the "established judicial rule of evidence that testimony or prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."

Construing this language, lower federal courts have consistently reiterated that the trial judge is vested with broad discretion in determining the admissibility of evidence of conduct falling within the protection of the *Noerr-Pennington* doctrine. *See e.g., Lamb Enterprises, Inc. v. Toledo Blade Co.*, 461 F.2d 506, 516 (6th Cir. 1972), *cert. denied*, 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972); *Household Goods Carrier's Bureau v. Terrell*, 452 F.2d 152, 158 (5th Cir. 1971)

(*en banc*); *Weit v. Continental Illinois National Bank and Trust Company of Chicago,* 467 F.Supp. 197 (N.D.Ill.1978) at 207–208, n.22; *United States v. Southern Motor Carrier's Rate Conference,* 439 F.Supp. 29, 47 (N.D.Ga.1977); *United States v. Johns-Manville Corp.,* 259 F.Supp. 440, 453 (E.D. Pa.1966), *cited with approval in Lamb Enterprises, supra.*

Moreover, those courts which have passed upon the issue have employed a balancing test to determine the admissibility of such evidence. In *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530 (5th Cir. 1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), the Fifth Circuit Court of Appeals elaborated:

> Admissibility, we think, should be governed by a test that weighs the probativeness of and the plaintiff's need for the evidence against the danger that admission of the evidence will prejudice the defendant's first amendment rights.

*Id.* at 543 n.7. The Court went on to hold that the probative value of the evidence was far outweighed by the defendant's First Amendment interests. And, in *Lamb Enterprises, Inc. v. Toledo Blade Co., supra,* this very Court (Judge Krupansky) denied admissibility of a letter which related a contemplated course of action directed at the Toledo City Council and intended to "forestall a competitor" finding that the prejudicial impact thereof far outweighed its probative value. The Sixth Circuit affirmed, holding that the aforesaid ruling did not constitute an abuse of discretion.

At this juncture of the proceedings, and as a part of its case-in-chief, the plaintiff seeks through the examination of Donald H. Hauser, defendant's general attorney, to enter upon a course of inquiry, the sole purpose of which is to elicit testimony of CEI's intent or design to delay, impede or make more costly, the construction and completion of a 69KV interconnection between the period March through December 19, 1972, thereby triggering the introduction of protected *Noerr-Pennington* evidence incorporated in Stipulations 226 through 241 heretofore excluded by this Court for the reasons set forth in its oral opinion of September 19, 1980. (Transcript of original trial 1243–1266).

At the first trial of this cause, the Court ultimately acceded to plaintiff's request to introduce the evidence incorporated into Stipulations 226 through 241 only after the defendant had affirmatively elicited from its own witnesses during the presentation of the defendant's case-in-chief evidence which compelled the inference that CEI undertook no conduct to impede, hinder or delay the construction of the 69KV temporary emergency interconnection. In permitting the stipulations to be read to the jury, the Court adopted the pronouncements of the Fifth Circuit in *Household Goods Carrier's Bureau v. Terrell, et al.,* 452 F.2d 152, 158 (5th Cir. 1971) (*en banc*). In that case, the Court of Appeals authorized the introduction of evidence of protected activity "to rebut the insinuations *put into evidence by the defendants".* *Id.* (emphasis supplied). That is to say, the Court sanctioned the use of *Noerr-Pennington* evidence only after the defendants themselves had "opened the door" by introducing evidence designed to create, in the minds of the jury, prejudicial inferences which could only be dispelled by the admission of constitutionally protected activity.

Both the Fifth Circuit in *Household Goods* and this Court during the first trial, recognized that a defendant may, through the presentation of its own evidence, "open the door" to the introduction of privileged *Noerr-Pennington* conduct. However, neither the Fifth Circuit opinion in *Household Goods* nor this Court's prior decision in the first trial lend the slightest support to the City's assertion that a plaintiff may, at will, trigger the admission of the constitutionally protected activity simply by undertaking a course of examination which is solely designed to create an inference which may be dispelled by disclosure of the protected activity. To adopt the City's position would

emasculate and indeed gut the constitutional protection afforded under the *Noerr-Pennington* doctrine and have a "chilling effect" upon the exercise of First Amendment rights.

■ To preserve the integrity of the *Noerr-Pennington* doctrine, this Court, in accordance with the pronouncements of the Fifth Circuit in *Household Goods*, is of the opinion that the instant plaintiff must be foreclosed from undertaking a course of examination which is specifically and solely designed to trigger the admission of the constitutionally protected activity here in question.[1] In light of the fact the only instance of protected conduct sought to be introduced herein relates to a lawsuit which, the City concedes, did not actually affect the construction of the 69KV intertie, the plaintiff may not inquire as to activity undertaken by CEI which was merely "designed" to delay, impede, or make more costly the construction of the 69KV temporary emergency interconnection. This is not to foreclose the City from adducing evidence of unprotected activity which the plaintiff maintains did in fact delay, impede or make more costly the said interconnection.

Although plaintiff may not, at this juncture, initiate inquiry designed solely to trigger admission of *Noerr-Pennington* conduct, the Court recognizes, of course, that the evolution of the defendant's evidence may "open the door" for the introduction of such conduct, as occurred during the first trial.

IT IS SO ORDERED.

## ON MOTION TO READ ADMISSION TO JURY

■ Presently before the Court is what is styled "Plaintiff City of Cleveland's Mo-

tion that CEI's Evidentiary Admission that the Relevant Geographic Market is the City of Cleveland Be Read to the Jury". The defendant has, by memorandum of August 31, 1981, responded in opposition.

A review of the record discloses that the instant motion is premised upon certain proposed findings of fact and conclusions of law which were submitted by the defendant on February 23, 1976, in excess of five (5) years ago. The plaintiff currently maintains that two (2) of the proposed findings contained in CEI's February 23, 1976 submission, both of which pertain to the issue of the relevant geographic market, constitute evidentiary admissions which may be properly presented to the jury. In urging the Court to permit the jury to consider the proposed findings here in issue, the City seeks to avail itself of a line of authority which holds that the allegations of a superseded *pleading* may, in appropriate circumstances, and at the behest of the opposing party, be introduced into evidence as evidentiary admissions. *See Raulie v. United States*, 400 F.2d 487 (10th Cir. 1968); *Shell v. Parrish*, 448 F.2d 528 (6th Cir. 1971); *Wiseman v. Reposa*, 463 F.2d 226 (1st Cir. 1972). As explained by Dean McCormick:

> If a *pleading*, or allegation therein, is amended, withdrawn, or superseded by a substitute pleading, it ceases to be usable as a conclusive judicial admission, but is admissible in evidence in the case in which filed at the instance of the adversary as an evidentiary admission.

*McCormick on Evidence*, § 265 at 634 (footnote omitted, emphasis supplied).

In assessing the foregoing contentions, the Court would observe that the plaintiff is apparently unable to identify any case authority which lends the slightest support to its view that the principles governing the evidentiary use of superseded pleadings ap-

---

1. The Court finds entirely unpersuasive the City's contention that the heretofore adduced testimony of Hauser has already served as a predicate for the introduction of the constitutionally protected activity described in Joint Stipulations 226–241. A review of the testimo-

ny in question discloses beyond peradventure that Hauser's responses pertained solely to the construction of the 138KV permanent synchronous interconnection and did not concern the 69KV temporary intertie. *See* Transcript at pp. 14,189–14,192.

ply with equal force to filings which merely consist of a litigant's proposed findings of fact and conclusions of law. That is to say, the plaintiff has utterly failed to direct the Court's attention to any legal authority which would support the City's rather novel contention that proposed findings of fact— as opposed to the formal pleadings encompassed within the definitional provisions of Rule 7(a), Fed.R.Civ.P.,—may properly serve as evidentiary admissions.

The City nevertheless proceeds to urge, without supporting authority, and in altogether cursory fashion, that proposed findings of fact and formal pleadings are sufficiently similar in nature and purpose as to warrant similar evidentiary treatment. Plaintiff's Brief in Support of Motion at p. 2, n.3. It would appear, however, that proposed findings are in reality "no more than informal suggestions for the assistance of the court" which bear little resemblance to the formal averments which necessarily comprise a litigant's pleading. 9 Wright and Miller, Federal Practice and Procedure § 2578 at 704 (1971). Indeed, arguments substantially similar to that currently advanced by the City have been consistently rejected by the prevailing case authorities. *See Taylor v. Allis-Chalmers Manufacturing Co.*, 320 F.Supp. 1381, 1384–85 (E.D.Pa. 1969), *aff'd.*, 436 F.2d 416 (3d Cir. 1970) (statements of counsel contained in pretrial memorandum do not constitute judicial admissions); *Parker v. Stern Brothers & Co.*, 499 S.W.2d 397, 411 (Mo.1973) (proposed findings of fact do not represent judicial admissions or admissions by pleadings).

The Court is thus persuaded by its review of the applicable authorities that there is no merit to the plaintiff's contention that CEI's proposed findings of February 23, 1976 constitute evidentiary admissions which may properly be conveyed to the jury in the course of the instant retrial proceedings. The Court is similarly persuaded that even in the event the proposed findings could be fairly considered evidentiary admissions—a conclusion which, as previously detailed, is simply not supported by the governing authorities—the defendant has effectively withdrawn any admissions which might otherwise be said to be contained in the February 23, 1976 submission by formally notifying both the Court and the parties, by filing of June 15, 1979, that the legal and factual positions taken by CEI as of February 23, 1976, and expressed in the defendant's memorandum of that date, no longer constitute the defendant's "views of fact or law in this litigation." Notice of Withdrawal of CEI's Memorandum in Support of Jury Instructions. That is to say, the City's suggestion that CEI has been remiss in failing to withdraw the proposed findings is not, in view of the defendant's filing of June 15, 1979, supported by the record.

It appearing to the Court that the proposed findings here in issue do not represent evidentiary admissions within the meaning of the controlling authorities, and it appearing in any event that the defendant has, by virtue of its June 15, 1979 submission, effectively withdrawn the proposed findings upon which the City relies, the plaintiff's motion to read to the jury certain of the defendant's February 23, 1976 proposed findings of fact and conclusions of law is without merit and hereby denied.

IT IS SO ORDERED.